### LANGAN v. FRANCKLYN et al.

#### (City Court of Brooklyn, Special Term. March 19, 1892.)

1. CORPORATIONS—TITLE TO STOCK.
    In an action by a stockholder of a corporation to enjoin its consolidation with another corporation, the question whether its directors are *bona fide* owners of the stock standing in their names, and therefore authorized to be directors, cannot be tried.

2. SAME—NOTICES OF MEETING—NAME OF CORPORATION.
    The fact that a notice given under the provisions of the statute for consolidation of corporations, requiring notice of a stockholders' meeting to vote on the question to be given them, adds to the name of the corporation words designating its location, does not invalidate it, no one having been misled thereby, and every stockholder having in fact had actual knowledge of the meeting.

3. SAME—PROXIES.
    The fact that proxies referred to the corporation under the name used in the notice does not affect their validity.

4. SAME—ACTS OF DIRECTORS.
    The acts of the directors of a corporation in dealing with themselves as directors of another corporation are not absolutely void, but can be set aside only in an action for that purpose, to which all interested are made parties, in case of bad faith.

5. SAME—CONSOLIDATION—AMOUNT OF STOCK.
    The provision of the statute for consolidation of corporations, that the amount of the stock of the consolidated company shall not be more than the "fair aggregate value" of the property, franchises, and rights of such corporations, limits the stock of the proposed corporation to the net value of the property, etc., of the component corporations in excess of their liabilities.

6. SAME—INJUNCTION.
    When the proposed stock is in excess of such amount, the consolidation may be enjoined at the suit of a stockholder, he not being limited to the remedy provided by Laws 1890, c. 567, § 14, allowing any stockholder objecting to consolidation to have his stock appraised, and receive the value thereof, thereupon ceasing to be a stockholder.

Action by James Langan, suing on behalf of himself and other stockholders similarly situated, etc., against Charles G. Francklyn, Samuel J. Young, William F. Van Pelt, Charles L. Morgan, Miles A. Brown, Henry H. Adams, Henry Mactier, and the Union Gaslight Company, to enjoin a consolidation of corporations. Injunction granted.

*Hoadley, Lauterbach & Johnson,* for plaintiff. *Butler, Stillman & Hubbard,* for defendants.

OSBORNE, J. The plaintiff is a stockholder of the Union Gaslight Company, and he brings this action on behalf of himself and other stockholders similarly situated, and who may come in and contribute to the costs and expenses of this action, against the said company and the other defendants, comprising its board of directors, to enjoin a proposed consolidation of said company with the Citizens' Gaslight Company; and the complaint also seeks other relief. By subdivision 3 of section 61 of chapter 566 of the Laws of 1890 it is provided that two or more gas companies may consolidate into a single corporation by complying with the provisions of the business corporations law, relating to the consolidation of business corporations. These provisions are found in section 13 *et seq.* of chapter 567 of the Laws of 1890. The proceedings for consolidation herein referred to had so far progressed that an agreement for consolidation had been made between the board of directors of the Citizens' Gaslight Company, and the terms of consolidation were submitted to a meeting of the stockholders of the Union Gaslight Company, when this action was commenced, and a temporary injunction was granted, restraining further proceedings, which injunction was continued pending this action.

In his complaint, the plaintiff, in brief, charges that the defendant Francklyn and others organized a company under the laws of the state of Kentucky called the International Gas Company; that the said Francklyn and others, acting under cover of the International Gas Company, in 1889 acquired some 6,900 shares of the Union Gaslight Company, and caused themselves to be elected directors thereof; that they caused a mortgage of $500,000, securing bonds of like amount, to be executed by said company, and that thereafter, in their capacity as directors of the Union Gaslight Company, dealing with themselves as the board of directors of said International Gas Company, they entered into a contract with the International Gas Company for the purchase of certain patent rights or licenses thereunder, which contract it is claimed was illegal and improvident; that this consolidation is now sought to be carried out with a view of covering up the aforesaid illegal proceedings; and on various other grounds set up in the complaint (which I shall consider hereafter more fully) it is claimed that the provisions for the consolidation of the Union Gaslight Company with the Citizens' Gaslight Company have not been carried out in accordance with the statute, and that said consolidation ought not to be carried out; and the plaintiff asks judgment that the proposed consolidation be permanently enjoined; that the issue of bonds to secure the $500,000 mortgage by the Union Gaslight Company be adjudged illegal and void; that the defendants Francklyn, Young, and Van Pelt (who are directors of the International Gas Company) be enjoined from any further participation as members of the board of directors of the Union Gaslight Company, and for such other relief as may be proper. The answer of the defendants denies all improper conduct on their part, and alleges and claims that all their proceedings have been regular, and that the proposed consolidation of the Union Gaslight Company will be a great advantage to the Union Gaslight Company. And they further allege and claim that the plaintiff has a full, adequate, and complete remedy in respect to all the matters alleged in the complaint under the provisions of section 14 of said chapter 567 of the Laws of 1890, which provides that any stockholder objecting to consolidation may apply to the supreme court for the appointment of appraisers, have his stock appraised, and receive the amount of such appraised value.

A very large amount of evidence has been adduced before me on the trial of this action, occupying some six days in its presentation. The following facts, among others, are shown by this evidence:

The Union Gaslight Company was incorporated in June, 1861, under the gas company act of 1848, to supply gas to the town of New Lots, now the Twenty-Sixth ward of the city of Brooklyn. Its capital was $100,000, which in 1885 had been increased to $250,000, divided into 10,000 shares of the par value of $25 each. On the 1st of July, 1885, it mortgaged its property to the Mercantile Trust Company, to secure bonds to the amount of $250,000 issued by it. In 1889 the works of said Union Gaslight Company were in a dilapidated condition, and it had ceased to manufacture gas entirely, purchasing the same from another company to supply to its consumers. On December 7, 1887, the International Gas Company was incorporated under the laws of Kentucky, with a capital of $500,000, divided into 5,000 shares of the par value of $100 each, and its purposes were declared to be to manufacture gas, construct gas works, purchase, hold, and deal in gas-manufacturing patents and also in gas stocks. The directors mentioned in its certificate of incorporation for the first year were Francklyn and Van Pelt, two of the defendants in this action, together with Messrs. McHorney, Sickels, and Joline; and Mr. Francklyn was president of the company. Five hundred shares of the capital stock of this company were sold at its par value, $50,000, to certain parties who subscribed for the same. This money,—$50,000,—together with the remaining 4,500 shares of the capital stock of the International Company, were transferred to one Arthur G. Meese in payment for certain

patent rights which had been obtained by him relating to an improved method of manufacturing gas. Mrs. Francklyn, the wife of the defendant Francklyn, had, about a year previously, acting under her husband's advice, bought a one-third interest in said patent rights from Meese, and she received from Meese about 1,200 shares of the stock of the International Company. Out of the $50,000 in cash paid to Meese he paid to Francklyn one third of this amount, under a previous arrangement with him. In addition, Francklyn had one or two shares transferred to him to qualify him as a director. Meese, in addition, voluntarily transferred to Van Pelt, for the benefit of the company, about 350 shares of the stock so issued to him. The defendant Van Pelt, a codirector with Francklyn, it appears had been in Mr. Francklyn's employ for 11 or 12 years, and he also got a little of the stock. On or about the 7th of May, 1889, Francklyn, on behalf of the International Gas Company, entered into an agreement with Staples & Co., a firm of brokers of this city, to buy about 8,000 shares of the Union Gaslight Company's stock, agreeing to pay therefor $14 a share; making a total purchase price of about $112,000. This purchase money was to be paid one half in cash and one half in notes at 12 months. On the 3d of June the International Company, by resolution, approved the agreement so made by Francklyn. On the 1st of August, 1889, the International Gas Company paid Staples & Co. the sum of $5,000 on account of the purchase price of said stock, which money it had obtained from a previous sale of some of its stock. On the 19th of August, 1889, the International Company sold 250 shares of their stock to one William L. Boyle, and got from him $15,000 on account. They also sold 50 shares more, and got in $5,000 on that. Then the International Company borrowed $30,000 from Staples & Co., and paid them $46,000 on account of the purchase of the Union Gaslight Company's stock, being the $30,000 so borrowed, in addition to the money that they had already realized on the sales of their stock, the International Company giving its note at three months to Staples & Co. for the $30,000 so borrowed, and at the same time pledging one half of the Union Gas Company's stock so bought by it through Staples & Co. as collateral security for the payment of said note. The other half of the Union Gaslight Company's stock agreed to be purchased by the International Gas Company was deposited with the Central Trust Company as collateral security for the payment of the notes of the International Company, payable in one year, and which were given for the other half of the purchase money. In July, 1889, Messrs. Francklyn and Van Pelt, who were directors in the International Gas Company, were elected directors of the Union Gaslight Company. Three or four months later, the defendant Morgan, who was also a director in the International Gas Company, was elected a director of the Union Gaslight Company. Boyle and the defendant Young also became directors of the Union Gaslight Company. Young was made president of the Union Gaslight Company. He had had 10 shares of its stock transferred to him by one Samuel Hatton, which were paid for by the International Gas Company, and he became a director of the company at Mr. Francklyn's request. He now claims to own said 10 shares on account of compensation due him for services as an accountant in examining the books of the Union Gaslight Company for Francklyn prior to August, 1889. Francklyn had 10 shares of stock transferred to him by N. Comstock, that belonged to and were paid for by the International Gas Company. Van Pelt got 10 shares from the International Gas Company, which were transferred to him by Mr. Francklyn's orders, at whose request he became a director, and he claims to be the owner thereof, and says that he intends to credit it at its par value in his account with the International Gas Company for a balance due him as secretary of the International Gas Company. Morgan and Boyle became directors of the Union Gaslight Company at Francklyn's request, and he caused stock belonging to the International Gas Company to be transferred

to them by N. Comstock; they paying nothing for it. In August, 1891, Boyle was succeeded as a director in said Union Gaslight Company by the defendant Miles A. Brown, then and now secretary and treasurer of the company. Francklyn gave him 10 shares of the stock without consideration.

The control of the Union Gaslight Company thus passed into the hands of Mr. Francklyn and his associates. On the 25th of October, 1889, they adopted a resolution to make a new mortgage of $500,000 to secure its 500 bonds of $1,000 each, the mortgage covering all its real estate, and being made under chapter 480 of the Laws of 1867, on the assent of two thirds of its stockholders, in which assent the International Gas Company signed for 7,980 shares. The bonds under this mortgage were disposed of as follows: $250,000 thereof were set aside to retire the prior issue of bonds made under the mortgage of July, 1885, to the Mercantile Trust Company; $180,000 thereof were paid to the International Gas Company under the agreement next hereinafter specified; $9,000 thereof were paid to Messrs. Crimmins & Co. for laying gas mains and pipes; and the balance of $61,000 remained the property of the company, and have been used by it as collateral for loans made to it. On the 25th of November, 1889, the International Gas Company presented a proposal to the Union Gaslight Company, and a resolution of acceptance of such proposal was adopted. By virtue of such resolution, on the 16th of December, 1889, the International Gas Company contracted with the Union Gaslight Company to erect for it gas works of a capacity of 500,000 feet in 24 hours, and also agreed to grant a license to the Union Gaslight Company to use the Meese patents on its paying a royalty of 12 cents for each 1,000 feet of gas manufactured under said patents, and the International Company agreed to accept therefor $180,000 of the bonds of the Union Gaslight Company. This contract further provided that the Union Gaslight Company should have a right, at any time within three years from date, to commute this royalty by paying the sum of $100,000 in cash. The contract further provided that $100,000 of these bonds were to be delivered on signing the license to work under the Meese patent. No such license has ever been signed, although the full amount of the $180,000 worth of bonds has been paid to the International Gas Company. The International Gas Company paid to the Continental Iron Works about $85,000 for building the gas works for the Union Gaslight Company, which it had contracted to build, as above stated. This plant has never, as yet, been put in working operation. On December 19, 1889, the International Gas Company sold $91,000 of the Union Gaslight Company's bonds at 90, and received therefor $81,900. With this money they paid off the loan of $30,000 from Staples & Co., above referred to, and they also paid their notes for the one half of the purchase money of the Union Gaslight Company's stock, which were deposited with the Central Trust Company. It will thus be seen that, by virtue of these contracts and arrangements, the International Gas Company became the owners of about 8,000 shares of the stock of the Union Gaslight Company at an original cash outlay of about $20,000, and it also received $180,000 of the bonds of the company for building gas works and a license to use the Meese patent, for which gas works, as before stated, they only paid the sum of $85,000. 6,100 shares of the stock of the Union Gaslight Company were subsequently pledged with Boyle & Co. as security for loans. Subsequently these 6,100 shares, together with 800 more, were delivered to I. B. Newcombe & Co., with other securities, as collateral for a loan of $100,000. This stock was thereupon transferred to the name of Camille Weidenfeldt, a member of said firm of I. B. Newcombe & Co., and he voted on said stock in favor of consolidation. Of the balance of the Union Gaslight Company's bonds which the International Gas Company had, $40,000 were sold at 90, through Boyle & Co., $4,000 thereof were sold at 80, and $45,000 thereof were pledged with other collateral with various parties to cover loans of about $60,000.

The following facts appear from the evidence with reference to the Citizens' Gaslight Company: This company was incorporated on October 25, 1858, with a capital of $1,000,000, divided into 50,000 shares of the par value of $20 each. In 1885 the capital was increased from $1,000,000 to $1,200,000. On the 1st of April, 1885, a mortgage was executed by said Citizens' Gaslight Company for $250,000 to the Long Island Loan & Trust Company, to secure bonds for that amount. On or about the 22d of April, 1889, the above-mentioned firm of I. B. Newcombe & Co. first became stockholders in the Citizens' Gaslight Company by a transfer to said firm of 2,801 shares from Staples & Co.; and Mr. Weidenfeldt, a member of said firm of I. B. Newcombe & Co., also at the same time became a stockholder by a transfer of 200 shares from Staples & Co. On the 15th of July, 1889, an agreement was entered into between the International Gas Company, above mentioned, and the Citizens' Gaslight Company, by which the latter company agreed to alter its works, and use the Meese process, and pay 12 cents per thousand feet royalty for all gas manufactured under said process; and it was further provided that, if the cost did not exceed 45 cents per 1,000 feet, the Citizens' Gaslight Company were to pay the International Gas Company the sum of $15,000 cash in addition; and it was further provided by said contract that the Citizens' Company should have an option to buy the sole right for Brooklyn under said Meese gas patents within one year, for a sum to be agreed on, which should not exceed $500,000. On the 16th of December, 1889, Mr. Weidenfeldt was elected a director of the Citizens' Gaslight Company. On the 8th of February, 1890, Newcombe & Co. transferred 20 shares each to Mr. S. A. Lathrop, John Byrne, and Frank Sullivan Smith. On the 14th of February, 1890, Messrs. Lathrop, Byrne, and Smith were also elected directors of the Citizens' Gaslight Company, and, at the solicitation of Newcombe & Co., Lathrop became the president of the Citizens' Gaslight Company. Prior to that time Mr. Lathrop had been serving as secretary of the Utica & Black River Railroad. On the 11th of January, 1890, a resolution was adopted by the directors of the Citizens' Gaslight Company to call a stockholders' meeting, with a view of increasing the capital stock of said Citizens' Gaslight Company from $1,200,000 to $1,500,000. In 1890 and 1891 the board of directors of the Citizens' Gaslight Company consisted of Mr. Lathrop, who was president and treasurer; Mr. Weidenfeldt, of said firm of Newcombe & Co.; Mr. Byrne, who has an office with Newcombe & Co.; Mr. Frank S. Smith, a lawyer, having an office in the same building with Newcombe & Co.; Mr. S. J. Dennison; and Mr. W. L. Boyle. Boyle resigned about August, 1891, and Mr. Thomas H. Thomas was elected in his place. On the 12th of March, 1890, a stockholders' meeting was held pursuant to the above resolution, at which it was voted to increase the capital stock of the Citizens' Gaslight Company from $1,200,000 to $1,500,000. Of this increase of $300,000 of stock Mr. Weidenfeldt subsequently subscribed for 14,965 shares thereof, and paid therefor in October the sum of $299,300. The other 35 shares were subscribed for by Mr. R. N. Ritch, who paid $700 therefor. On the 18th of September, 1890, a resolution was adopted by the Citizens' Gaslight Company to purchase the Meese patents for $500,000 in stock and bonds. On the 22d of September, 1890, an agreement in writing was entered into by which the Citizens' Gaslight Company agreed to purchase of the International Gas Company said Meese patents for Brooklyn, including said contract with the Union Gaslight Company, for $500,000, payable not before October 25, 1890, and not later than November 30, 1890, with the following proviso inserted: "Unless prevented by order, judgment, or decree of a court of competent jurisdiction." This consideration of $500,000, it was provided, was to be payable $250,000 in stock and $250,000 in bonds at par, with the option to the Citizens' Gaslight Company to pay in cash in whole or in part. On the 27th of October, 1890, a resolution was passed by the Citizens' Gaslight Company to pay

this consideration of $500,000 as follows: $250,000 thereof in cash, and $250,000 thereof in bonds, although the stock of the Citizens' Gaslight Company at that time was selling at about 91 on the stock exchange, while its bonds were selling at a premium of about 3 per cent. On the 27th of October, 1890, the Citizens' Gaslight Company executed and acknowledged to the Central Trust Company of New York its so-called "consolidated first mortgage" for $750,000, bearing date February 1, 1890, and the same was recorded October 28, 1890, and was given to secure the payment of 750 of the Citizens' Gaslight Company's bonds of $1,000 each. This mortgage was executed under a resolution of the Citizens' Gaslight Company's board of directors, and without notice to its stockholders, under the law authorizing directors to mortgage real and personal property in an amount not exceeding one half of the capital stock of the company. It will be borne in mind that the capital stock of the Citizens' Gaslight Company had been increased in March previous to $1,500,000, and Mr. Weidenfeldt had subscribed for $299,300 of said increase. Of these bonds so issued under this mortgage it was resolved that $250,000 thereof should be used to redeem the previous issue of bonds under the mortgage of the Long Island Loan & Trust Company, $250,000 thereof were to be used in payment for the Meese patents, and $250,000 thereof were to be retained for the future business requirements of the Citizens' Gaslight Company, and they are still unissued. On the 31st of October, 1890, the Meese patents for the city of Brooklyn and the contract with the Union Gaslight Company were assigned to the Citizens' Gaslight Company, and the International Gas Company received therefor $250,000 in cash of the $299,300 subscribed as aforesaid by Weidenfeldt, and $250,000 in bonds of the Citizens' Gaslight Company issued under said mortgage for $750,000. Thereupon, and on the same day, the International Gas Company purchased from said Weidenfeldt 12,500 shares of the Citizens' Gaslight Company of the par value of $250,000, and paid him therefor $40 a share, or at the rate of 200 market quotation, he receiving in payment the cash and bonds received by the International Gas Company from the Citizens' Gaslight Company for the Meese patents. It will thus be seen that for 12,500 of the 14,965 shares of the Citizens' Gaslight Company for which Mr. Weidenfeldt subscribed, as above stated, he not only received back $250,000 of the amount that he paid therefor, but, in addition, $250,000 of the bonds of the Citizens' Gaslight Company, which bonds at that time were selling for a premium. The International Gas Company shortly after pledged the 12,500 shares of Citizens' Gaslight Company's stock so purchased by it from Weidenfeldt, and other Union Gaslight Company stock and other collaterals, with Boyle & Co., as collateral security for loans of about $185,000; and along in November, 1890, the loan not being paid, and the stock market being depressed by the failure of Messrs. Baring & Co. of London, the Citizens' Gaslight Company's stock so pledged was sold out by Boyle & Co. at about 70. Right here I may remark that on the 24th of January, 1891, 6,700 of these shares again became the property of Mr. Weidenfeldt, and on August 29, 1891, 4,500 more of these shares also became the property of Mr. Weidenfeldt.

The foregoing is a very brief *resume* of the more salient facts bearing upon the matters in litigation in this action. Extremely exhaustive and voluminous briefs have been submitted to me by the learned counsel of both parties, and I have given the same a very thorough and complete examination. Owing to the time so consumed, and the pressure of other judicial duties, I am unable now to more than give in brief the conclusions at which I have arrived on the respective points raised by the learned counsel for the plaintiff which they claim would justify the granting of the relief sought herein.

It is claimed on behalf of the plaintiff that the consolidation proceedings are illegal, because they never received any valid inception from the board of directors of the Union Gaslight Company as required by the statute. In fact,

the learned counsel contends that there is substantially no valid board of directors; and he bases his contention on the fact that the by-laws of the Union Gaslight Company provide that each of its directors "shall be a *bona fide* owner of not less than ten shares of the capital stock of the company." Counsel contends that the parties who voted for the consolidation agreement on behalf of the Union Gaslight Company were not, with one exception, "*bona fide* owners" of the stock standing in their respective names. That the parties holding the position of directors were stockholders of record on the books of the Union Gaslight Company is not disputed, and that would seem to be a *prima facie* answer to the contention of the learned counsel for the plaintiff. While it is true that in proceedings properly taken for that purpose a court can go behind the record of stockholders as shown by the transfer book, with a view of inquiring as to whether the parties in whose names stock stands are really the owners thereof, (*Strong* v. *Smith,* 15 Hun, 222, and cases there cited,) yet this is not such a proceeding, and I am of the opinion that I cannot, in this action, try the title of the directors of the Union Gaslight Company to the offices which they claim to hold.

Under the statute for consolidation it is provided that notice of a stockholders' meeting to vote on the question of consolidation shall be given by mailing the same to the stockholders thirty days prior to the meeting. and also by publishing notice of a meeting for three successive weeks. The learned counsel for the plaintiff claims that such action has not been taken by the Union Gaslight Company, and he seeks to base his contention on the fact that the notice published was addressed to the stockholders of "the Union Gaslight Company of East New York," and that the notice was of a meeting of the stockholders of "the Union Gaslight Company of East New York," and that the same designation was contained in the notice mailed to the stockholders. He claims that by the addition of the words "of East New York" to the corporate title of the Union Gaslight Company no valid notice of a meeting of the stockholders of the Union Gaslight Company was given. Quite a number of authorities have been cited by him as affecting the proper designation of corporations. Most of those cases are cases in the nature of trademark, and have no bearing, in my opinion, on the point here raised. This provision of the statute was intended to cause the fullest notice to be given to the stockholders of the corporations proposed to be consolidated. There is no pretense here that any stockholder of the Union Gaslight Company was deceived or misled by this form of notice. It appears that the notice of the meeting was mailed to each of the stockholders, and that the heading thereof was as follows: "Union Gaslight Company, 26th Ward, Brooklyn, formerly East New York." All but four of the stockholders were present in person or by proxy at said meeting, and those four had knowledge of said meeting, thus showing conclusively that nobody was misled. I think the provision of the statute has been complied with in this respect.

The further point is raised that the proxies of a portion of the stock sought to be voted on at the stockholders' meeting referred to a special meeting of the shareholders of the "Union Gaslight Company of East New York." For the same reasons as last stated, this contention cannot be sustained.

The learned counsel for the plaintiff further contends that, even if the proxies had been perfect, more than two thirds of the capital stock of the company was disqualified from voting. This contention is based on the fact that the International Gas Company has owned, since August 20, 1889, and still owns, 6,900 shares of the Union Gaslight Company's stock. Counsel claims that such holding of stock in this company by a corporation is not allowed by the laws of this state, and that, although this stock of the International Gas Company stood in the name of Mr. Weidenfeldt, as representing the pledgees thereof, he took it with notice, and he has no better title to it, and is no more entitled to vote on it, than the International Company would

be. The same answer applies to this proposition as I have above set forth with reference to the point raised that the directors of the Union Gaslight Company were not legally qualified directors. I may further add that, as the International Company, by its charter under the laws of Kentucky, was authorized to purchase, hold, and deal in gas stocks, I am of the opinion that that there is nothing in the laws of this state which would make such holding by it illegal.

The learned counsel for the plaintiff further claims that the mortgage of $500,000, made by the Union Gaslight Company to the Central Trust Company, is void, and that it never had any valid inception. He even goes further, and claims that it was part of a fraudulent scheme and conspiracy by which, substantially, the directors of the International Gas Company, sitting as directors of the Union Gaslight Company, voted to said International Gas Company a large portion of the additional issue of bonds under said mortgage, and that the equivalent given therefor in the shape of a license to work under the Meese patent on payment of a royalty was of little or no value, although the International Gas Company realized about $100,000 from the sale of this license to the Union Gaslight Company. I do not understand that the mere fact that the action of the directors of the International Gas Company sitting as directors of the Union Gaslight Company, and dealing in that capacity with themselves as directors of the International Gas Company, makes their acts actually void. The most that can be said, as I read the decisions, is that such acts will be scrutinized with the utmost care; that the greatest good faith must be exercised; and that if, on a proper proceeding had for that purpose, it should appear that an undue advantage was taken by one company of the other, such agreement would be unhesitatingly set aside by the court. This action is not a proceeding of that character, and the simple fact that neither the Central Trust Company (the mortgagee in said mortgage,) nor any of the holders of the bonds issued thereunder, nor the International Gas Company, are made parties hereto, is, in my opinion, a complete bar to any adjudication on my part in this action respecting the validity of that mortgage, or the validity of the contract for the purchase of the Meese license. In arriving at this conclusion, I do not intend in any way to be considered as upholding the fairness and good faith of the bargain made between the International Gas Company and the Union Gaslight Company, which was effected mainly by the action of the directors of the International Gas Company, acting and voting as directors of the Union Gaslight Company. The International Company seems to have been organized mainly with a view to dispose of interests under the Meese patents at a profit to itself. At the time it bought the stock of the Union Gaslight Company at 56, the works of the latter company were in a dilapidated condition, and it had ceased to pay dividends for some years. Yet no sooner is the International Company in control of a majority of the stock of the Union Gaslight Company than it proceeds to obtain control of its board of directors, to increase its mortgage debt $250,000, and to cause the transfer to it of $180,000 of the bonds of the Union Gaslight Company, giving in return therefor a gas plant costing about $85,000, and a license to manufacture gas under the Meese patents at a royalty of 12 cents per 1,000 feet, coupled with a privilege to purchase within three years the right to the Meese patents in the Twenty-Sixth ward on paying $100,000 therefor. I cannot but regard the bargain, on all the evidence in the case, as an unconscionable one.

The learned counsel for the plaintiff further contends that the proposed consolidation agreement is illegal, because the proposed capital of the consolidated company of $2,000,000 is far in excess of what the law allows. The statutory provision for consolidation above referred to provides for an agreement of consolidation, which shall prescribe, among other things, the amount of the capital stock of the consolidated company, "which shall not be larger in amount

than the fair aggregate value of the property, franchises, and rights of such corporations," etc. By "fair aggregate value" the statute means, in my opinion, the net value of the property, franchises, and rights of the corporations proposed to be consolidated in excess of the respective liabilities of such corporations. The learned counsel for the defendants claims that the following values of the assets of the Union Gaslight Company are established by the evidence:

| | |
|---|---|
| Properties, which include all the real estate, plant, holders, tanks, mains, pipes, etc., he fixes at - - - - | $435,000 |
| Patents rights, (license to use Meese patents,) - | 150,000 |
| Franchises, - - - - - - - | 250,000 |
| Total, - - - - - - - - | $835,000 |

I am of the opinion that these estimates of value are higher than the evidence fairly justifies. Mr. Young, the president of the company, testifies that the total value of the property of the company, exclusive of its patent rights and franchises, is a little over $400,000. The estimate of the value of the right to work under the Meese patents is, in my judgment, excessive. The company paid $180,000 in its bonds for this right, and a plant which cost about $85,000 to erect, so that the International Company only received (in bonds) for the right so assigned about $95,000, and no higher estimate of value should be placed thereon.

| | |
|---|---|
| The value of all the property of the Union Gaslight Company, as estimated by its president, exclusive of patent rights and franchises, is - - - - - - - | $400,000 |
| Patent right license, worth, say, - - - - | 95,000 |
| Franchises, claimed to be worth - - - - | 250,000 |
| Making a total of - - - - - - | $745,000 |
| From which is to be deducted its liabilities, stated by Mr. Young to be between $515,000 and $520,000, say, - - | 515,000 |
| Making the fair net value of the property, franchises, and rights of the Union Gaslight Company, on a liberal estimate, to be - - - - - - - | $230,000 |

The learned counsel for the defendants further claims that the following values of the assets of the Citizens' Gaslight Company are established by the evidence:

| | |
|---|---|
| All property, exclusive of patent rights and franchises, - | $1,192,000 |
| Patent rights, - - - - - - - | 1,000,000 |
| Franchises, - - - - - - - | 500,000 |
| Making an aggregate of - - - - - | $2,692,000 |

These valuations are likewise excessive. While I am of the opinion that the evidence shows that the Meese patent has proven to be an advantageous process to the company, yet a valuation of $1,000,000 is, in my judgment, utterly absurd.

The evidence shows that there are between 4,500 and 5,000 gas companies in the United States; yet, notwithstanding the International Company was organized in 1887, with a capital of $500,000, based on these patents, and with a view to promote the sale and use thereof, the Citizens' Gaslight Company and the Metropolitan Gas Company of Elizabeth, N. J., of which the defendant Francklyn is president, are the only two companies in the United States using these patents. If they are anything like as valuable as defendants claim, it is very strange that all the other gas companies in the United States have remained blind to their merits. The Citizens' Gaslight Company, it is true, paid $500,000 in bonds and cash for the sole right to use these patents

in this city and adjacent towns to the International Gas Company; but when it is shown that the latter company straightway took the whole of this consideration money, and purchased with it from Mr. Weidenfeldt 12,500 shares of the Citizens' Gaslight Company's stock of the par value of $250,000, at 200, although the market price on the New York Stock Exchange at that time was only 91, I cannot believe, and do not believe, that such a bargain was made in good faith, but that it must have been carried out by virtue of some preconcerted arrangement with I. B. Newcombe & Co., or Mr. Weidenfeldt, of said firm. The only pretense attempted to be set up for this absurd bargain is that the International Gas Company was desirous of buying some stock in the Citizens' Gaslight Company as an investment, and it is alleged that an attempt on the part of the International Gas Company to go into the stock market and buy 12,500 shares out of a capital of 75,000 shares would have put the stock up from its then selling price of 91 to above 200. No evidence is adduced before me to support any such theory, nor is Mr. Weidenfeldt called as a witness to explain a transaction that, under all the circumstances, and considering the situation of the parties to it, seems to me to call loudly for an explanation. It does appear that almost immediately after the so-called "investment" by the International Company in the stock of the Citizens' Gaslight Company, the International Company was a borrower in the "street," and was pledging this very stock, together with other assets, as collateral security for money borrowed by it. Under such circumstances, as I say, the transaction does not impress me as being an honest one, and I cannot escape the conclusion that this purchase by the Citizens' Gaslight Company was a fraud upon its stockholders.

Under no circumstances should the value of this patent right as an asset of the Citizens' Gaslight Company be placed at a higher sum than $250,000, that being about an equivalent of what the International Gas Company actually realized from its sale. This gives us a total of $1,942,000 as the value of the property, franchises, and rights of the Citizens' Gaslight Company; and the estimate, in my judgment, is a most liberal one. From this $1,942,000 is to be deducted $500,000 of debts, being the outstanding mortgage for which the bonds have been issued, which leaves $1,442,000 as the aggregate value of the property, franchises, and rights of the Citizens' Gaslight Company. Adding this to the $230,000 valuation of the property, franchises, and rights of the Union Gaslight Company as above set forth, we have a total valuation of $1,672,000, which I regard as being an estimate of the most liberal character. The capital of the proposed consolidated company is sought to be fixed at the sum of $2,000,000. This is $328,000 larger in amount than the fair aggregate value of the property, rights, and franchises of both corporations, and it is therefore a violation of the statutory provisions respecting consolidation, and, in my judgment, affords ample ground for the interference of this court at the instance of the plaintiff or any other stockholder.

The learned counsel for the defendants claims that the provisions of section 14 of chapter 567 of the Laws of 1890 afford the plaintiff all the remedy which he is entitled to for any injustice which he may believe will be done to him by the proposed consolidation. That section provides that any stockholder objecting to consolidation may apply to the supreme court for the appointment of appraisers to appraise the value of his stock, and that, when appraised, and on payment of such appraised value by the new corporation, his rights as a stockholder shall cease. I am of the opinion that this is not the sole remedy that the plaintiff has for any injustice which he may deem is sought to be perpetrated. This is one way provided by the statute for giving him relief; but there is no intimation in the statute that this is the sole relief which plaintiff is entitled to, nor is there any information that the regular, usual, and ordinary equitable powers of the courts are sought to be interfered with or limited by this provision of the statute, or that the provisions of the

statute are to be substituted for the equitable powers of the court. In view of the foregoing facts, I am of the opinion that the plaintiff is entitled to judgment permanently enjoining the proposed consolidation of said Union Gaslight Company and said Citizens' Gaslight Company, and that he is also entitled to recover costs of the defendant the Union Gaslight Company.