Louis H. PINK, Superintendent of Insurance of the State of New York, etc., Plaintiff, v. TITLE GUARANTEE AND TRUST COMPANY, Defendant.

Supreme Court, Trial Term, Kings County, August 31, 1937.

*Hughes, Richards, Hubbard & Ewing* and *John F. Caskey* [*Curtiss E. Frank* and *John R. McCullough* of counsel], for the plaintiff.

*Milbank, Tweed, Hope & Webb* [*W. H. L. Edwards, Richard S. Holmes, Harold P. Winans, Eugene Z. DuBose* and *William Dean Embree* of counsel], for the defendant.

KADIEN, J. The Superintendent of Insurance of the State of New York, as rehabilitator of the Bond and Mortgage Guarantee Company (hereinafter referred to as the mortgage company), seeks to recover from the defendant Title Guarantee and Trust Company (hereinafter referred to as the title company) the purchase price of sixty-two subordinate interests in mortgages aggregating $803,600, with accrued interest thereon of $12,798.58, and $51,098.71 paid to certain brokers as commissions, together with interest on these amounts from the respective dates of payment.

Sixty-two causes of action are pleaded, each of which is predicated upon a separate mortgage held by the title company in its investment account. It is claimed that upon the sale to investors of prior interests in these mortgages the title company transferred subordinate interests therein to the mortgage company for their face value and accrued interest, and in addition, in some of them caused the mortgage company to pay brokerage commissions for the sale of the prior interests.

The plaintiff has made a tender of such of the subordinate interests as were in his possession, together with the avails thereof, and has instituted this equity action to rescind the transfer thereof and recover the moneys paid in connection therewith.

It is the contention of the plaintiff that the transfer of each of the subordinate interests is voidable because it was accomplished by officers common to the mortgage company and the title company, and that each of such transfers was unfair, illegal, *ultra vires* and contrary to statute.

On the other hand, it is urged by the defendant that unfairness has not been established in these transactions, and that they may not be rescinded merely because they were effected through common officers, particularly since all have been executed; and that in any event the plaintiff and the mortgage company have, by their conduct in delaying rescission and acting inconsistently therewith, precluded themselves from maintaining this action.

It is not disputed that prior to the acquisition of the subordinate interests here involved the mortgage company never held such assets in mortgages of the title company; and such as it had were the result of having retained junior interests in mortgages of its own where the prior interests were sold guaranteed.

The organization and investments of the mortgage company were governed by the Insurance Law. Its activities came under the supervision of the State Superintendent of Insurance. The act under which it was incorporated provided: " It shall be lawful for any corporation organized under this act to invest its capital and funds accumulated in the course of its business, or any part

thereof, in bonds and mortgages on unincumbered and improved real estate within the State of New York, worth fifty per centum more than the sum loaned thereon." (Laws of 1885, chap. 538, § 14.)

Section 173 of the Insurance Law, formerly section 176 (Laws of 1892, chap. 690, as amd. by Laws of 1904, chap. 543), required the mortgage company to keep its minimum capital " invested in the same kind of securities as is required for the minimum capital of other insurance corporations incorporated under this chapter." Said section also required that its " guaranty fund," consisting of not less than two-thirds of its total paid-in capital, be invested in minimum capital investments. The kind of securities above referred to is defined in subdivision 1 of section 16 of the Insurance Law as follows: " The cash capital of every domestic insurance corporation required to have a capital, to the extent of the minimum capital required by law, shall be invested and kept invested in the stocks or bonds of the United States or of this State, not estimated above their current market value, or in the bonds of a county or incorporated city in this State authorized to be issued by the Legislature, not estimated above their par value or their current market value, or in bonds and mortgages on improved unincumbered real property in this State worth fifty per centum more than the amount loaned thereon."

It is clear, therefore, that the enabling act authorizing the organization of mortgage guaranty corporations and the statutes regulating their investments both specified that the bonds and mortgages lawful for them to invest their funds shall be upon improved and unincumbered real property worth fifty per cent more than the sum loaned thereon.

Subordinate interests in first mortgages cannot in any sense be regarded as mortgages on unincumbered real property. Furthermore, as admitted by the defendant's answer, there were substantial tax arrears with respect to many of the mortgages at the time the transfers of the subordinate interests therein were made.

It is argued by the defendant that while it may perhaps be true that the investment of capital in subordinate interests in first mortgages was technically *ultra vires* and not within the express or implied powers of the mortgage company as fixed by the act under which it was incorporated, nothing therein expressly prohibited such investments and, therefore, they were not illegal. In my opinion, however, the acquisition by and the transfer to the mortgage company of these subordinate interests was not only *ultra vires* in the sense that it was outside the objects for which the company was created, as defined by the enabling act, but it was illegal in the sense that it violated the Insurance Law which limited

the character of the investments it could make. The specifications of section 16 of the particular securities in which it should be lawful for the mortgage guaranty corporation to invest, by implication operated to *restrain and prohibit* investments other than enumerated.

After all, the intent of these provisions was to protect the policy-holders of insurance companies, and the beneficiaries of the mortgage company guaranties, by requiring these companies to invest their funds in securities deemed sound by the Legislature. The very purpose of this legislation would be destroyed if investments in securities other than those specified could be made with impunity.

In holding that the deposit of certain moneys of an insurance company with a bank to loan on call was prohibited, the Attorney-General (Op. Atty.-Gen. 1911, vol. 2, pp. 402, 403) said: " Section 16 of the Insurance Law attempts to safeguard the funds of insurance companies by limiting their investment to certain classes of securities specified in detail."

In *Matter of General Reinsurance Co.* v. *Pink* (269 N. Y. 347) the Court of Appeals was called upon to construe subdivision 4 of section 16 of the Insurance Law which prohibited the invest-ment of more than fifty per cent of the surplus funds of domestic insurance companies in the stock of other insurance companies. In discussing section 16 of the Insurance Law, the court character-ized it as a " comprehensive investment code for insurance corpora-tions " and a provision, with others, " obviously framed for purposes of safety and security * * * almost all of them * * * evoked by dire experience." In concluding the opinion, the court said: " So when the Legislature has in substance said that the assets of insurers in an amount equal to their liabilities, their capital and at least fifty per cent of their surplus should be invested in specified types of securities, which exclude the stock of other insurers, we may be reasonably certain it did not intend that the surplus of any company should, by gift or otherwise, be built up in disregard of the limitation. It intended for competitive reasons to grant insurers an opportunity to secure business through control of other companies so far, and only so far, as might be consistent with safety and stability. In short, the intent was that all assets from whatever source derived should be subject to the provisions of section 16."

Similarly in the situation at bar we may be certain that the Legislature did not intend that a mortgage company should acquire assets such as subordinate interests, in disregard of limitations contained in the statutes which required investment in bonds and mortgages to be only on unincumbered and improved real estate worth fifty per cent more than the sum loaned thereon.

In the case of *Pratt* v. *Short* (79 N. Y. 437) the question of the power of a certain safe deposit company to discount notes was held to depend upon its charter and the limitations and restrictions contained in the general statutes of the State applicable to the corporation. In holding that the specification of securities in which it should be lawful for the corporation to invest, prohibited the investment in other securities, than enumerated, the court said (at pp. 442, 443): " But the mode of investment is prescribed in the eleventh section, and the specification of the particular securities in which it should be lawful for the corporation to invest, operates by implication to restrain and prohibit investments in any securities other than those particularly enumerated. This rule of construction has been frequently recognized and applied. In *New York Firemen Ins. Co.* v. *Ely* (2 Cow. 678), SUTHERLAND, J., referring to the claim that the company in that case was not prohibited from investing its surplus funds in loans upon promissory notes, said: ' The sixteenth section of the act expressly provides that it shall be lawful for the corporation to invest their capital, or any portion of it, either in the stock of the United States, or of the individual States, thus by the strongest implication prohibiting any other mode of investment, and destroying the inference which might have resulted from the absence of all regulations on the subject.' "

The mortgage company was organized in 1892 by the trustees of the title company, to serve as guarantor of mortgages which the latter would place and sell to the investing public. At all times the two companies were closely affiliated and their activities and relationship intertwined. During the time that the transactions complained of took place, the two companies had a common management. Clinton D. Burdick was president and director of both companies; Frederick P. Condit was executive vice-president of the title company and senior vice-president of the mortgage company, and a director in both; Harold W. Hoyt was vice-president of the title company and treasurer of the mortgage company; John H. Low was real estate officer; Frank E. Morgan comptroller, and Charles Hoffman auditor of both companies; some employees were likewise common to both companies; the expenses of a number of departments of both companies were shared under a joint facilities agreement, and pursuant to the by-laws and standing orders of the mortgage company, the title company kept and audited its books. In short, the defendant " knew as much about the mortgage company's affairs as did the latter itself." (*Van Schaick* v. *Title Guarantee & Trust Co.*, 252 App. Div. 188, 202.)

It was clearly established at the trial, principally through the testimony of officers of the title company, that the transactions

which resulted in the transfer to the mortgage company of the subordinate interests involved herein were initiated and effectuated through common officers and directors, particularly Clinton D. Burdick, president and director of both companies, and that the board of directors or stockholders neither authorized, passed upon, approved nor ratified any of these transactions.

It has been held that the relation of a director and officer to a corporation is of a fiduciary nature. (*Pink* v. *Title Guarantee & Trust Co.*, 274 N. Y. 167.) He is held " to the duty of constant and unqualified fidelity." (*Munson* v. *Syracuse, G. & C. R. R. Co.*, 103 N. Y. 58.) His personal dealings with his corporation are jealously guarded by the courts, as are also transactions between boards having common members. (*Geddes* v. *Anaconda Mining Co.*, 254 U. S. 590.) Where he is a director of two corporations, he holds the relation of trustee to both. (*Globe Woolen Co.* v. *Utica G. & E. Co.*, 224 N. Y. 483.)

The reason for this attitude is clear. " A man cannot serve two masters." Corporations must transact business through agents. (*New York Central Ins. Co.* v. *Nat. Prot. Ins. Co.*, 14 N. Y. 85, 89, 91.) " Owing to the elements inherent in the operation of business corporations, the vast majority of their stockholders can exercise but the slightest measure of individual power and judgment in their actual conduct. They must, perforce, look to their officers and directors therefor. These persons are the servants of the stockholders. More than that, they are wholly and unqualifiedly trustees." (*Hauben* v. *Morris*, 161 Misc. 174, 188, 189.)

As said by the Court of Appeals in *Meinhard* v. *Salmon* (249 N. Y. 458, 464): " Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ' distintegrating erosion ' of particular exceptions. (*Wendt* v. *Fischer*, 243 N. Y. 439, 444.) Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

The courts of this State have, in the past, upheld this fiduciary principle to the extent even of setting aside, regardless of fairness, intercorporate transactions effectuated through common officers and directors. (*Munson* v. *Syracuse, G. & E. R. R. Co.*, 103 N. Y.

58; *Burden* v. *Burden,* 159 id. 287; *Globe Woolen Co.* v. *Utica Gas Co.,* 224 id. 483; *Wendt* v. *Fischer,* 243 id. 439; *New York Central Ins. Co.* v. *Nat. Prot. Ins. Co.,* 14 id. 85, 91, 92.)

It is the contention of the defendant, however, that the more liberal and advanced rule is that intercorporate transactions effected through a common officer or director will be closely scrutinized by the court " and not set aside if it clearly appears to be just and fair in every respect " (3 Fletcher Cyclopedia Corporations [Permanent ed.], § 962, p. 343), or, as stated in 2 Thompson on Corporations (3d ed. § 1346, p. 840): " Such contracts will be enforced where they are entirely honest and fair, but not where they are tainted with fraud or breach of trust; " or, as stated in the case of *Langan* v. *Francklyn* (29 Abb. N. C. 102, 109), " the greatest good faith must be exercised, and that if * * * it should appear that an undue advantage was taken by one company of the other, such agreement would be unhesitatingly set aside by the court."

I am of opinion that the fairness contemplated by the rule contended for by the defendant is fairness in the sense of the absence of fraud or imposition or undue advantage or illegality, rather than in the sense merely of benefit, value or soundness of the transaction.

The principle laid down by the Court of Appeals in the case of *Pink* v. *Title Guarantee & Trust Co.* (274 N. Y. 167) is not to the contrary. There the court stated that without inquiry as to whether or not the transaction was beneficial to the complaining corporation, *ultra vires* transactions accomplished by a common directorate, which are illegal and fraudulent, may be set aside, whether executory or executed. Said the court: " Having the common directorate and the result having been accomplished by acts *ultra vires* and otherwise illegal and fraudulent, whether executory or executed, the transaction, although not absolutely void, might have been avoided by the Bond and Mortgage Guarantee Company without inquiry by the court as to whether the transaction was beneficial to it or not (*Burden* v. *Burden,* 159 N. Y. 287, 307; *Globe Woolen Co.* v. *Utica G. & E. Co.,* 224 N. Y. 483; *Wendt* v. *Fischer, supra; Steinbeck* v. *Bon Homme Mining Co.,* 152 Fed. Rep. 1333; *Corsicana Nat. Bank* v. *Johnson,* 251 U. S. 68) or by the stockholders within a reasonable time after the discovery of the fraud. (*Corsicana Nat. Bank* v. *Johnson, supra.*)"

Upon reargument the court (274 N. Y. 610) said: " We expressed no opinion on the merits of the issues which must await trial. Nothing we have said may properly be construed as an expression of opinion, or assumption, that the cause of action alleged may be established merely by proof that the result, even though, perhaps,

beneficial to the plaintiff, has been accomplished by acts which are *ultra vires*, but not otherwise illegal and fraudulent."

I am of the opinion that both under the rule contended for by the defendant and the principle enunciated in *Pink* v. *Title Guarantee & Trust Co. (supra)*, the transfer to and the acquisition by the mortgage company of the subordinate interests involved herein must be set aside. These transactions, as already demonstrated, were not alone *ultra vires*, but illegal as prohibited by statute. Further than that, I deem the transfer of such subordinate interests to the mortgage company tainted with imposition, injustice and breach of trust. As already noted, the *raison' d'ê'tre* for section 16 of the Insurance Law was to protect policyholders and beneficiaries of mortgage company guaranties, and its enactment was "evoked by dire experience." The holders of these policies and guaranties had the right to expect and presume that insurance and mortgage guaranty corporations would invest their capital and funds in securities enumerated in this section, and not in others.

Not alone that. The subordinate interests here involved were transferred to and acquired by the mortgage company between about the 6th day of July, 1932, and the 9th day of February, 1933. The courts have already held that on March 13, 1933, the mortgage company became insolvent and that "naturally long prior" to that date "both the mortgage company and the title company had felt the force of the depression." (*Van Schaick* v. *Title Guarantee & Trust Co., supra.*)

To what extent the force of the depression was felt by the mortgage company may be gathered from the following comparative figures, based primarily upon documentary evidence. First will be discussed the situation affecting mortgages guaranteed by the company, and thereafter mortgages and other assets owned by the company.

With respect to the former, the interest in arrears over thirty days as of January 31, 1931, amounted to $265,000, and as of December, 1932, $3,673,000.

Interest advanced by the company but not received from debtors and past due thirty days amounted to $1,074,358 as of January, 1932; and $4,922,084 as of February, 1933.

The principal amount of pending foreclosures increased from $5,380,200 as of January, 1931, to $11,954,795 as of December 31, 1931; $23,200,995 as of June 30, 1932; $32,935,696 as of December 31, 1932; $38,680,771 as of January 31, 1933; and $43,177,746 as of February 28, 1933.

The principal amount of guaranteed mortgages not yet under foreclosure but with arrears in interest thereon for more than

thirty days increased from $22,005,425 as of December 31, 1931; to $50,254,810 as of June 30, 1932; $102,637,442 as of December 31, 1932; and $129,421,489 as of February 28, 1933.

With respect to mortgages owned by the company, the interest in arrears increased from approximately $17,000 in January, 1931, to nearly $4r0,000 as of December 31, 1932.

The principal amount of company-owned mortgages under foreclosure was $233,475 as of December 31, 1931; $507,775 as of June 30, 1932; and $1,120,015 as of December 31, 1932.

If, added to these figures, we consider the mortgages in default for interest due more than thirty days but not under foreclosure, we have the principal amount of $447,650 as of February 28, 1931, and $6,860,043 as of December 31, 1932, or an increase from 3.5 per cent to 70.8 per cent.

As of January 31, 1931, the mortgage company owned real estate of the approximate value of $1,300,000. This was increased principally through foreclosures to almost $10,000,000 as of December 31, 1932. Of such real estate $1,342,115, or 13.5 per cent, represented capitalized foreclosure costs. During the six months period ending December 31, 1932, the company sold real estate of the principal amount of $2,134,490, and suffered a loss thereon of $430,680. It took back in connection with such sales first purchase-money mortgages of $1,730,500, second purchase-money mortgages of $101,425, and only $302,565 in cash.

To what extent the character of the assets of the company changed may be readily observed from the following comprehensive percentage charts in evidence:

|  | June 30, 1931. Per cent of total assets | Dec. 31, 1932. Per cent of total assets |
| --- | --- | --- |
| Bonds and mortgages not in default | 51.2 | 5.9 |
| Bonds and mortgages in default | 2.0 | 25.5 |
| Certificates | 1.6 | 2.7 |
| Interest receivable past due over thirty days | 2.1 | 13.2 |
| Interest receivable due and accrued | 5.2 | 7.8 |
| Real estate | 6.0 | 32.2 |
| Cash | 13.4 | 4.9 |
| Stocks and bonds, governments | 2.1 | ........ |
| Stocks and bonds, affiliated companies | 6.1 | 5.1 |
| Stocks and bonds, others | 10.3 | 2.3 |
| Other assets | ........ | 0.4 |
|  | 100.0 | 100.0 |

In *Van Schaick* v. *Title Guarantee & Trust Co.* (*supra*) the court in holding that the mortgage company was insolvent as of March 13, 1933, discussed in detail the financial condition of the company; and what was there said may well be considered here in view of the fact that the period now under consideration was so close to the date of insolvency. After all, insolvency does not occur overnight, and according to the figures above set forth the insolvency found by the court was long foreshadowed. There is no serious dispute that the condition of the mortgage company grew worse in the middle of the year 1932; sales of mortgages became increasingly difficult; values had dropped; and as testified by one of the brokers through whom some of the prior interests herein had been sold, it was not possible to sell mortgages for their face value.

As was said in the opinion of the Appellate Division in the *Van Schaick* case (*supra*):

" Moreover, the mortgage company faced the prospect of paying guaranteed interest in the sum of $23,212,634.86 for the months of April, May, June and July of 1933, of which, however, one-twelfth, or one-half of one per cent, belonged to it as its premium.

" The balance sheet of the mortgage company as of March 13, 1933, showed capital surplus and undivided profits listed in the sum of $22,770,612."

With such conditions prevailing; with a mounting trend towards increased delinquency in the payment of interest; with an increase in the acquisition of real estate through foreclosures; and with its cash rapidly decreasing and the liquidity of its assets seriously impaired, the mortgage company was caused to acquire *for cash* through the action of officers common to both companies, principally Clinton D. Burdick, their president, the subordinate interests in question, without the knowledge or consent of the board of directors or the stockholders, and without subsequent ratification.

The life blood of the mortgage company was the interest it could collect from mortgagors when due, and the very foundation of its existence was the willingness of investors to continue their mortgage investments at maturity, instead of demanding payment. It is clear that in both these respects the company was in a precarious condition at the time that the subordinate interests were acquired. We have already observed how rapid was the increase of foreclosures and how great was the amount of arrears in interest. In the six-month period ending December 31, 1932, such increase, in round figures, was from $50,254,000 to $102,637,000. As of February, 1931, the total of matured guaranteed whole mortgages was $3,976,994. This had increased by December, 1932,

to $51,515,098, of which payment was demanded with respect to $16,125,050. In addition there were as of the latter date $9,505,309 of certificates past due as to which the eighteen-month clause had been invoked.

It is urged by the defendant that the transfer of the subordinate interests to the mortgage company was made as a matter of routine in the interests of business efficiency, and that Mr. Burdick, the president of both companies, as a layman, did not know the nature of these assets when he authorized their transfer. Certainly the title company, which had been engaged in all phases of the mortgage business since 1883, could have just as easily handled subordinate interests.

It taxes the court's credulity to believe that Mr. Burdick and those associated with him did not know that it was an imposition and unfair to the mortgage company's interests to deplete its already low cash position by acquiring for cash subordinate interests in mortgages which appear not only to have been unsalable but beyond the power of the company to acquire, and in contravention of statutes limiting the character of its investments.

It would seem to be unnecessary to dwell further upon the undue advantage taken of the mortgage company by officers and directors common to it and the title company; but what was done by them in causes of action twenty-five to twenty-nine, inclusive, and cause of action twenty-four, is so grossly inequitable and unconscionable that the factual situation therein involved must be set forth.

In the five causes of action numbered twenty-five through twenty-nine, it appears that in each instance the title company advanced money on building loans and the mortgages were given title company permanent investment numbers. On December 28, 1932, with respect to the twenty-fifth and twenty-sixth causes of action, and on December 31, 1932, with respect to the twenty-seventh, twenty-eighth and twenty-ninth causes of action, the title company, in consideration of the face value thereof paid in cash, assigned the whole mortgages to the mortgage company. *On the same dates that those assignments were made* prior interests in such mortgages were sold to the Corn Exchange Bank, the mortgage company retaining subordinate interests in such mortgages in the aggregate sum of $306,500.

These prior interests were sold through the instrumentality of the so-called Buckner Pool, which had been organized in the late fall of 1932 by Mr. Mortimer Buckner, chairman of the board of New York Trust Company, and Charles S. Brown, a trustee of the title company, " to help out some of the guaranteed mortgage companies." It was intended that through this pool the New York

banks would purchase mortgage investments of the *guaranteed mortgage companies in order to liquify their assets so that they might meet their maturities under their guaranties.* Among the mortgages submitted to this pool were the mortgages involved in these five causes of action. It was unknown to Mr. Merrick, who had been designated as the secretary of the appraisal committee of the pool, until a few weeks before the trial herein, that any of these mortgages had been owned by the title company, and not by the mortgage company.

In submitting mortgages which had been owned by the title company instead of the mortgage company for sale through this pool, the purposes of the pool were not alone thwarted so that the mortgage company did not receive the benefits for which the pool was organized, but its cash position was actually impaired to the extent of $306,500. Instead of mortgage company assets becoming liquefied to the extent of $1,341,000 through sales of mortgages through this pool ($1,341,000 being the prior interests sold), the assets of the title company were turned into cash to that extent, and the mortgage company became less liquid by $306,500, the face value of the subordinate interests.

In cause of action No. twenty-four, the loan in the principal amount of $50,000 was made by the title company. On November 30, 1931, the title company assigned the mortgage to the Corn Exchange Bank Trust Company and entered into a repurchase agreement, under the terms of which *the title company agreed to repurchase the mortgage within ninety days.* On November 30, 1931, the mortgage company guaranteed the mortgage to the Corn Exchange Bank, which guaranty remained in force until February 4, 1932, when this mortgage was repurchased. The debit voucher was originally prepared as a title company debit voucher, but this was changed by someone to a mortgage company debit voucher by stamping the name of that company thereon. The only persons who could have authorized this change were Messrs. Hoyt or Burdick, both of whom were common officers. As a result of this change, the mortgage company acquired the mortgage that the title company was obligated to repurchase. *The assignment from the Corn Exchange Bank, however, was to the title company.* In the report to the Superintendent of Insurance for December 31, 1931, sworn to by Messrs. Burdick, Hoyt and Bothwell, they answered " no " to the question reading: " Has the Company guaranteed to repurchase on demand from the holder, irrespective of whether interest or principal or both are or are not past due, any mortgage loans on real estate, participation certificates in such mortgages or bonds secured by such mortgage? "

Thus the net result of this transaction was the liquefaction of the title company's assets to the extent of $420,000 through the sale of the prior interest in the mortgage and the outlay of $80,000 in cash by the mortgage company for the acquisition of a subordinate lien, which but for the transaction above set forth the title company would have retained.

The defendant contends that with respect to the six mortgages above discussed, rescission is impossible because the tender of the full mortgages has not been made, but only of the subordinate interests. But the mortgage company never in any real sense of the word owned the entire mortgages, and what is sought in this action is the recovery only of what it paid for the subordinate interests. The transactions whereby it acquired from the title company the whole mortgages and disposed of the prior interests therein, were wrongful. Under the circumstances disclosed, therefore, the plaintiff cannot be deprived of his rights merely because of the form employed by common fiduciaries.

I view all of the mortgages involved in this action, other than that in the fifty-second cause of action, as having been in fact owned by the title company prior to the transfer of the subordinate interests and the sale of the prior interests. The whole mortgages had been held by the title company in its permanent investment account for various periods of time, and there is no credible evidence upon which defendant's contention can find support that it was merely the selling agent for the mortgage company with respect to many of the mortgages involved herein. It owned these mortgages by assignment and up to the date of transfer of the subordinate interests received the full mortgage rate of interest. Upon such transfer the mortgage company paid accrued interest from the last interest date.

The fact that the transactions involved in this action have been executed does not, as contended by the defendant, bar rescission.

In *New York Central Ins. Co.* v. *Nat. Prot. Ins. Co.* (*supra*) the court said, with respect to an action to avoid a contract between two corporations effectuated through a common officer: " The principle has been most frequently applied to executed contracts and to sales of lands or goods, but in its nature it is equally applicable to executory agreements and to other subjects."

In *Mutual Life Ins. Co.* v. *Stephens* (214 N. Y. 488, 493) the court said: " If the agreement were wholly executory the answer to that question would not be doubtful [citing cases]. But it has been so far executed that it is impossible to restore the parties to their original situation."

In the case of *State Bank of Commerce* v. *Stone* (261 N. Y. 175) the court said: " By no means do we hold that although banks have no implied authority to place their securities for private deposits, yet after the thing is done it cannot be undone."

In *Pink* v. *Title Guarantee & Trust Co.* (*supra*), where a transaction similar to those at bar was involved, the court said: " Having the common directorate and the result having been accomplished by acts *ultra vires* and otherwise illegal and fraudulent, *whether executory or executed*, the transaction, although not absolutely void, might have been avoided."

Of course as a general rule an executed *ultra vires* contract may not be rescinded; but in the case at bar the plaintiff has tendered back everything the mortgage company has received. Furthermore, the transfer of the subordinate interests was illegal as well as *ultra vires*, and the sale thereof to the mortgage company had been imposed by common fiduciaries.

It is contended by the defendant that the plaintiff is not entitled to recover the $51,098.71 paid as commissions to the firm of brokers through whom prior interests had been sold to the Bowery Savings Bank, and that in any event it is an anomaly to include this demand in an action based upon rescission. These mortgages, as already observed, were owned by the title company. Upon no theory, therefore, can there be any justification for the payment by the mortgage company of commissions for the sale of the prior interests therein.

While it may be true that the plaintiff might have sought the recovery of this money by way of an action for damages, the defendant made no motions with respect to the complaint. Section 258 of the Civil Practice Act provides: " The plaintiff may unite in the same complaint two or more causes of action whether they are such as were formerly denominated legal or equitable, provided that upon the application of any party the court may in its discretion direct a severance of the action or separate trials whenever required in the interests of justice."

Furthermore, the moneys thus paid were directly connected with the transactions here involved, and as said in *Bosworth* v. *Allen* (168 N. Y. 157, 166): " When such damages are claimed, in connection with equitable relief, on account of a general course of injurious action * * *. Even if part of the relief could be had in actions at law, still, when it is sought in connection with strictly equitable relief such as the discovery of trust property and the recovery thereof, and the right to all relief springs from a common cause, such as a conspiracy, all may be included in the sweeping action for an accounting."

While this action is not for an accounting, I am of opinion that the foregoing principle is equally applicable.

As to the affirmative defenses (1) that the mortgage company delayed rescission with full knowledge of the facts and thereby has ratified the transactions sought to be set aside; (2) that the mortgage company in the acquisition of the subordinate interests involved herein acted through its board of directors with full knowledge of the facts; and (3) that the plaintiff and the mortgage company in rehabilitation, with knowledge of the facts, accepted and cashed the benefits from the subordinate interests, consisting of payments of interest and principal, the court finds that they have not been sustained either in fact or in law.

The court finds as a fact that the claims against the title company were consistently pressed by the plaintiff, who acted as promptly as the manifold duties of his department and the legal and accounting staffs engaged in the investigation of the affairs of the company would permit. The moneys tendered to the title company were kept in separate bank accounts and no action was taken by him with respect to the subordinate interests, except through non-prejudice agreements with the title company.

Whatever knowledge the individual officers or directors may have had with respect to the acquisition of the subordinate interests, does not alter the fact that neither the board of directors as such, nor the stockholders, ever authorized or ratified such acquisition. The minutes of the meetings of the executive committee and of the directors contain no mention thereof, and there was nothing in the auditing reports to indicate to any director that the subordinate interests were acquired from the title company and under what circumstances.

I am of opinion that the prevailing rule in New York with respect to delay in rescission is stated in *Richard* v. *Credit Suisse* (242 N. Y. 346, 351), wherein it holds by quotation from *Barnette* v. *Wells Fargo Nat. Bank* (270 U. S. 438) that "What promptness of action a court may reasonably exact * * * must depend in large measure upon the effect of lapse of time without such disaffirmance, upon those whose rights are sought to be divested."

In the case at bar there is a complete absence of proof that whatever delay occurred did in any way prejudice the defendant or cause it damage. Under these circumstances, therefore, the plaintiff had the full time permitted by the Statute of Limitations in which to bring suit. Nor do I believe that the receipt and acceptance of interest and payments on account of principal from mortgagors with respect to the subordinate interests, constitutes a ratification or election or shows the intent to abandon the claim of rescission.

In *People* v. *Straus & Co., Inc.* (158 Misc. 186, 213; modfd. in another respect and affd., 248 App. Div. 785, 2d Dept.) the court held that the acceptance and retention of interest on bonds after the discovery of fraud was not such an exercise of dominion as to preclude rescission. Said the court: " The interest which these claimants received under these various bonds was paid by the obligors, third parties, and the claimants were in any event entitled to retain it."

The plaintiff was not obliged as a condition for bringing this action to refuse the acceptance from third parties of moneys paid as interest and on account of principal on these subordinate mortgages, and keeping this money in separate accounts and tendering the same prior to the commencement of the action is an additional indication of the plaintiff's intention to repudiate.

As was said in *Keefuss* v. *Weilmunster* (89 App. Div. 306, 309): " She was not obliged, as a condition of invoking the aid of a court of equity, to step out into the streets, abandoning the property and taking the chances of proving her case; she had done her full duty in the premises when she offered to return the property to the defendants before bringing the action, and then, upon a refusal by the defendants to reconvey, continuing to hold and care for the property until it should be disposed of according to the facts which should be found upon the trial. Her possession, during the pendency of the action, was the involuntary possession of property which she had been fraudulently induced to take and which she had offered to return; and as she asked for a reconveyance only upon her own retransfer of the property which she had received from the defendants, which would include an accounting, there was no time in which all of the rights of the defendants were not secure."

Moreover, the plaintiff in his capacity as the Superintendent of Insurance of the State of New York, is acting as the statutory receiver for the mortgage company, and as such had no power to waive or ratify. (*Van Schaick* v. *Title Guarantee & Trust Co., supra.*)

Accordingly I grant the motion of the plaintiff for judgment as prayed for in the complaint in causes of action first to fifty-first, nclusive, and fifty-third to sixty-second, inclusive, and grant the defendant's motion for judgment with respect to the fifty-second cause of action. As to this cause of action it appears that the mortgage therein involved was to secure a loan by the title company. On February 10, 1933, this mortgage was purchased by the mortgage company and extended for three years. On the same day the mortgage company sold a prior interest and retained a subordinate interest. There is not sufficient proof in the record to connect this transaction with the title company.

Proceed accordingly on notice.