GLOBE WOOLEN COMPANY, Appellant, *v.* UTICA GAS AND ELECTRIC COMPANY, Respondent.

**Contract — director of two corporations holds relation of trustee to both — when unfair contract between two corporations brought about by influence of common director will be annulled.**

1. Where one is a director of two corporations he holds the relation of trustee to both, and when a contract involving important interests of both for a long time in the future is being negotiated, such trustee is free to stand aloof, while the other directors of both corporations act, if all is equitable and fair. He cannot, however, rid himself of the duty to warn and denounce if there is improvidence or oppression, either apparent on the surface, or lurking beneath the surface, but visible to him by reason of his superior knowledge of facts and conditions involved.

2. Where a harsh and unfair contract, resulting in great profit to one corporation at the expense of the other, is brought about by the dominating, or at least potent and persuasive, influence of a director of both corporations, who was the president and chief stockholder of the corporation which secured the advantage, and only nominally a stockholder of the other, having no interest therein, such contract is voidable and should be annulled, notwithstanding the dual director refused to vote, and was excused from voting, at the directors' meeting of the corporation suffering the loss, which accepted and ratified the unfair contract.

*Globe Woolen Co.* v. *Utica Gas & El. Co.*, 170 App. Div. 940, affirmed.

(Argued October 28, 1918; decided November 19, 1918.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the third judicial department, entered December 10, 1915, modifying and affirming as modified a judgment in favor of defendant entered upon the report of a referee.

The nature of the action and the facts, so far as material, are stated in the opinion.

*James F. Hubbell, Edgar M. Cullen* and *Adelbert Moot* for ·appellant. The Appellate Division erred . in holding that mere common directorship, without bad faith, made the contracts voidable. (*Gamble* v. *Queens County Water Co.,* 123 N. Y. 91; *Steinway* v. *Steinway,* 2 App. Div. 301; 157 N. Y. 710; *Strobel* v. *Brownell,* 16 Misc. Rep. 657; *Vonnoh* v. *Sixty-seventh Street Atelier Bldg.,* 55 Misc. Rep. 222; *Cowell* v. *McMillan,* 177 Fed. Rep. 25; Morawetz on Corp. § 527; *Burden* v. *Burden,* 159 N. Y. 287; *Continental Ins. Co.* v. *N. Y. & H. R. R. Co.,* 187 N. Y. 225; *Brooklyn Heights R. R. Co.* v. *Brooklyn City R. R. Co.,* 151 App. Div. 465; *U. S. R. S. Co.* v. *A. & G. W. R. R. Co.,* 34 Ohio, 450.)   The Appellate Division apparently overlooked the fact that the contracts were ratified and confirmed by a majority of the defendant's capital stock. (*Cont. Ins. Co.* v. *N. Y. & H. R. R. Co.,* 187 N. Y. .225; *Metropolitan Case,* 11 Daly, 373.)

*Nathan L. Miller* and *Pardon C. Williams* for respondent. Maynard bore the relation of trustee to the defendant and its stockholders and in his dealings with the defendant was subject to all of the obligations, duties and disabilities of a trustee. (*Hoyle* v. *P. & M. R. R. Co.,* 54 N. Y. 314; *Bosworth* v. *Allen,* 168 N. Y. 157; *Jacobson* v. *Brooklyn Lumber Co.,* 184 N. Y. 152; *People ex rel. Manice* v. *Powell,* 201 N. Y. 194; *Continental Securities Co.* v. *Belmont,* 206 N. Y. 7; *Billings* v. *Shaw,* 209 N. Y. 265.)   The burden was upon Maynard to prove that his dealings were fair and just and understood by the company. (*Cumberland Coal Co.* v. *Sherman,* 30 Barb. 553; *Nesbit* v. *Lockman,* 34 N. Y. 168; *Whitehead* v. *Kennedy,* 69 N. Y. 466; *Cowee* v. *Cornell,* 75 N. Y. 99; *Fisher* v. *Bishop,* 108 N. Y. 25; *Ten Eyck* v. *Whitbeck,* 156 N. Y. 341; *Butler* v. *Prentiss,* 158 N. Y. 49; *Heckscher* v. *Edenborn,* 203 N. Y. 210.)   Whereas the burden was upon the plaintiff to show that the contracts

were fair and honest, the defendant affirmatively established that they were unfair and unconscionable and that Maynard not only made use of his influence as a director in negotiating them, but also failed to disclose material facts which vitally affected the contracts. (*N. Y. Cont. Ins. Co.* v. *Nat. Pro. Ins. Co.*, 14 N. Y. 85; *Munson* v. *S., G. & C. R. R. Co.*, 103 N. Y. 59; *Welch* v. *I. & T. N. Bank*, 122 N. Y. 177, 189; *Barr* v. *N. Y., L. E. & W. R. R. Co.*, 125 N. Y. 272; *McGourkey* v. *Toledo O. C. R. R. Co.*, 146 U. S. 536.) Maynard did, in fact, use his influence acquired as director of the defendant to induce it to make the contracts. The defendant, therefore, is entitled to avoid the contract regardless of its fairness, and the case is in principle precisely the same as if he had openly assumed to act for both sides. (*Munson* v. *S., G. & C. R. R. Co.*, 103 N. Y. 59.)

CARDOZO, J. The plaintiff, a corporation, sues to compel the specific performance of contracts to supply electric current to its mills. The defendant, also a corporation, answers that the contracts were made under the dominating influence of a common director; that their terms are unfair, and their consequences oppressive; and that hence they may not stand. A referee has sustained the defense; and the Appellate Division, with some modification, has affirmed his judgment.

The plaintiff is the owner of two mills in the city of Utica. One is for the manufacture of worsteds and the other for that of woolens. The defendant generates and sells electricity for light and power. For many years John F. Maynard has been the plaintiff's chief stockholder, its president and a member of its board of directors. He has also been a director of the defendant, and chairman of its executive committee. He received a single share of the defendant's stock to qualify him for office.

He returned the share at once, and he has never held another. His property interest in the plaintiff is large. In the defendant he has none.

The history of the transaction may be briefly stated. At the beginning, the mills were run by steam, and the plant was antiquated and inadequate. As early as 1903, one Greenidge, then the superintendent and later the general manager of the defendant's electrical department, suggested to Mr. Maynard the substitution of electric power. Nothing came of the suggestion then. Mr. Maynard was fearful that the cost of equipment would be too great unless the defendant would guarantee a saving in the cost of operation. None the less, a change was felt to be important, and from time to time the subject was taken up anew. In 1904, there was an investigation of the power plant by Greenidge and a written report of its condition. For this service, though he was still in the defendant's employ, he was paid by Mr. Maynard. In 1905, the substitution of electricity was again considered, but dismissed as impracticable because of the plaintiff's continued insistence upon a guarantee of saving. In the fall of 1906, the project was renewed. It was renewed by Maynard and Greenidge, who debated it between themselves. There were other officers of the defendant who knew that the project was afoot, but they took no part in formulating it. Maynard still insisted on a guarantee of saving. The plaintiff's books were thrown open to Greenidge, who calculated for himself the cost of operation with steam and the probable cost with electricity. When the investigation was over, a contract was closed. It took the form of letters exchanged between Greenidge and Maynard. In the letter signed by Greenidge, the defendant proposed to supply the plaintiff's worsted mill with electricity at a maximum rate of $.0104 per kilowatt hour, and to guarantee that the cost for heat and light and power would

show a saving each month of $300 as compared with the cost for the corresponding month in the year previous to the change. There was to be a trial period ending July 1, 1907. Then, at the plaintiff's option, the contract was to run for five years, with a privilege of renewal for a like term. In a letter signed by Maynard on October 22, 1906, the plaintiff accepted the proposal. At once, the defendant made preparations to install the new equipment. Six weeks later, on December 1, 1906, Mr. Maynard laid the contract before the defendant's executive committee. He went to the meeting with Mr. Greenidge. The contract was read. Mr. Lewis, the vice-president, asked Mr. Greenidge what the rate would be, and was told about $.0104 per kilowatt hour. Mr. Beardsley, another director, asked whether the contract was a profitable one for the company, and was told by Mr. Greenidge that it was. Mr. Maynard kept silent. A resolution was moved and carried that the contract be ratified. Mr. Maynard presided at the meeting, and put the resolution, but was excused from voting.

This settled the problem of power for the worsted mill. Attention was next directed to the woolen mill. Again, Mr. Maynard and Mr. Greenidge put the project through, unaided. In February, 1907, letters, similar in most things to the earlier ones, were exchanged. The guarantee of saving for this mill as for the other was to be $300 a month. There were, however, new provisions to the effect that the contract should apply to " current used for any purposes in any extensions or additions to the mills," and that in case of shortage of electricity the plaintiff should be preferred in service over all other customers except the city of Utica. At a meeting of the executive committee, held February 11, 1907, this contract was ratified. The statement was made by Mr. Greenidge, in the presence of Mr. Maynard, that it was practically

a duplicate of the first contract, except that it related to another mill. Nothing was said about the new provisions. Mr. Maynard presided and put the resolution, but did not vote.

At a cost to the plaintiff of more than $21,000, the requisite changes in the mills were made, and the new power was supplied. It quickly appeared that the defendant had made a losing contract; but only gradually did the extent of the loss, its permanence and its causes unfold themselves. Greenidge had miscalculated the amount of steam that would be required to heat the dye houses. The expenditure for coal mounted by leaps and bounds. The plaintiff dyed more yarn and less slubbing than before. But the dyeing of yarn takes twice as much heat as that of slubbing, and thus doubles the cost of fuel. These and like changes in the output of the mills had not been foreseen by Greenidge, and Maynard had not warned of them. In 1909, the defendant became alarmed at the mounting loss. Various tests and palliatives were suggested and adopted, but there was no change in the result. Finally, in February, 1911, the defendant gave notice of rescission. At that time, it had supplied the plaintiff with electricity worth $69,500.75 if paid for at the maximum rate fixed by the contract, and $60,000 if paid for at the lowest rate charged to any customer in Utica. Yet not only had it received nothing, but it owed the plaintiff under its guarantee $11,721.41. The finding is that a like loss prolonged to the end of the term would amount to $300,000.

These are the contracts which the courts below have annulled. The referee annulled them absolutely. The Appellate Division imposed the condition that the defendant reimburse the plaintiff for the cost of installation. The defendant makes no complaint of the condition. The plaintiff, appealing, stands upon its bargain.

We think the evidence supports the conclusion that

the contracts are voidable at the election of the defendant. The plaintiff does not deny that this would be true if the dual director had voted for their adoption (*Munson* v. *Syracuse, G. & C. R. R. Co.*, 103 N. Y. 58). But the argument is that by refusing to vote, he shifted the responsibility to his associates, and may reap a profit from their errors. One does not divest oneself so readily of one's duties as trustee. The refusal to vote has, indeed, this importance: it gives to the transaction the form and presumption of propriety, and requires one who would invalidate it to probe beneath the surface (*Davids* v. *Davids*, 135 App. Div. 206, 209). But " the great rule of law " (ANDREWS, J., in *Munson* v. *Syracuse, G. & C. R. R. Co.*, *supra*, p. 73) which holds a trustee to the duty of constant and unqualified fidelity, is not a thing of forms and phrases. A dominating influence may be exerted in other ways than by a vote (*Adams* v. *Burke*, 201 Ill. 395; *Davids* v. *Davids, supra*). A beneficiary, about to plunge into a ruinous course of dealing, may be betrayed by silence as well as by the spoken word. The trustee is free to stand aloof, while others act, if all is equitable and fair. He cannot rid himself of the duty to warn and to denounce, if there is improvidence or oppression, either apparent on the surface, or lurking beneath the surface, but visible to his practised eye (*Davids* v. *Davids, supra; Crocker* v. *Cumberland Mining & Milling Co.*, 31 S. Dak. 137, 146; *Fort Payne Rolling Mill* v. *Hill*, 174 Mass. 224; *Wyman* v. *Bowman*, 127 Fed. Rep. 257, 274).

There was an influence here, dominating perhaps, and surely potent and persuasive, which was exerted by Mr. Maynard from the beginning to the end. In all the stages of preliminary treaty, he dealt with a subordinate, who looked up to him as to a superior, and was alert to serve his pleasure. There was no clean-cut cleavage in those stages between his conflicting offices and agencies (*Hoyle* v. *Plattsburgh & M. R. R. Co.*, 54 N. Y. 314, 328,

329). No label identified the request of Mr. Maynard, the plaintiff's president, as something separate from the advice of Mr. Maynard, the defendant's chairman. Superior and subordinate together framed a contract, and together closed it. It came before the executive committee as an accomplished fact. The letters had been signed and delivered. Work had been begun. All that remained was a ratification, which may have been needless, and which even if needful, took the aspect of a mere formality. There was some attempt to show that Mr. Lewis, the vice-president, had seen the letters before. The testimony of Mr. Greenidge indicates the contrary. In support of the judgment, we accept his testimony as true. That the letters had been seen by others, there is not even a pretense. The members of the committee, hearing the contract for the first time, knew that it had been framed by the chairman of the meeting. They were assured in his presence that it was just and equitable. Faith in his loyalty disarmed suspicion.

There was, then, a relation of trust reposed, of influence exerted, of superior knowledge on the one side and legitimate dependence on the other (*Sage* v. *Culver,* 147 N. Y. 241, 247; *Davids* v. *Davids, supra*). At least, a finding that there was this relation has evidence to sustain it. A trustee may not cling to contracts thus won, unless their terms are fair and just (*Crocker* v. *Cumberland Mining & Milling Co., supra,* and cases there cited; *Dougan* v. *MacPherson,* 1902, A. C. 197, 200; Thompson on Corp. 1228, 1231). His dealings with his beneficiary are "viewed with jealousy by the courts, and may be set aside on slight grounds" (*Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587, 588). He takes the risk of an enforced surrender of his bargain if it turns out to be improvident. There must be candor and equity in the transaction, and some reasonable proportion between benefits and burdens.

The contracts before us do not survive these tests. The unfairness is startling, and the consequences have been disastrous. The mischief consists in this: that the guarantee has not been limited by a statement of the conditions under which the mills are to be run. No matter how large the business, no matter how great the increase in the price of labor or of fuel, no matter what the changes in the nature or the proportion of the products, no matter even though there be extensions of the plant, the defendant has pledged its word that for ten years there will be a saving of $600 a month, $300 for each mill, $7,200 a year. As a result of that pledge it has supplied the plaintiff with electric current for nothing, and owes, if the contract stands, about $11,000 for the privilege. These elements of unfairness, Mr. Maynard must have known, if indeed his knowledge be material. He may not have known how great the loss would be. He may have trusted to the superior technical skill of Mr. Greenidge to compute with approximate accuracy the comparative cost of steam and electricity. But he cannot have failed to know that he held a one-sided contract, which left the defendant at his mercy. He was not blind to the likelihood that in a term of ten years there would be changes in the business. The swiftness with which some of the changes followed, permits the inference that they were premeditated. There was a prompt increase in the proportion of yarns as compared with slubbing when the guarantee of saving charged the defendant with the greater cost of fuel. But whether these and other changes were premeditated or not, at least they were recognized as possible. With that recognition, no word of warning was uttered to Greenidge or to any of the defendant's officers. There slumbered within these contracts a potency of profit which the plaintiff neither ignored in their making nor forgot in their enforcement. It is no answer to say that this potency, if obvious to

Maynard, ought also to have been obvious to other members of the committee. They did not know, as he did, the likelihood or the significance of changes in the business. There was need too of reflection and analysis before the dangers stood revealed. For the man who framed the contracts, there was opportunity to consider and to judge. His fellow members, hearing them for the first time, and trustful of his loyalty, would have no thought of latent peril. That they had none is sufficiently attested by the fact that the contracts were approved. There was inequality, therefore, both in knowledge and in the opportunity for knowledge. It is not important in such circumstances whether the trustee foresaw the precise evils that developed. The inference that he did, might not be unsupported by the evidence. But the indefinite *possibilities* of hardship, the opportunity in changing circumstances to wrest unlooked for profits and impose unlooked for losses, these must have been foreseen. Foreseen or not, they were there, and their presence permeates the contracts with oppression and inequity.

We hold, therefore, that the refusal to vote does not nullify as of course an influence and predominance exerted without a vote. We hold that the constant duty rests on a trustee to seek no harsh advantage to the detriment of his trust, but rather to protest and renounce if through the blindness of those who treat with him he gains what is unfair. And because there is evidence that in the making of these contracts, that duty was ignored, the power of equity was fittingly exercised to bring them to an end.

The judgment should be affirmed with costs.

HISCOCK, Ch. J., CHASE, COLLIN, CUDDEBACK and POUND, JJ., concur; ANDREWS, J., absent.

Judgment affirmed.