CLEVELAND-CLIFFS IRON CO. et al. v. ARCTIC IRON CO.*

(Circuit Court of Appeals, Sixth Circuit. October 7, 1919.)

No. 2758.

1. CORPORATIONS ⬦=187—CONTROVERSY BETWEEN STOCKHOLDERS; DISREGARD OF CORPORATE FORM.

Where two tenants in common of real estate created a corporation, with equal division of stock and of directors between them, for handling the common property, in a controversy between them neither party is entitled to obtain an advantage over the other by reason of the corporate form adopted, which may properly be disregarded by a court of equity, and the matter determined with reference only to their individual rights.

**2. Corporations** ⊜⇒318—Validity of contracts between; common director.

Where corporations A and B contract with each other with reference to known adverse and conflicting interests, and have a common director, who withdraws from and abandons his functions as director of A, and negotiates only on behalf of B, and so notifies his associate directors of A, and they accept his notice and ensuing responsibility, the strictest rule is only that the contract may be voidable by A, if in fact unfair to it.

**3. Corporations** ⊜⇒318—Validity of contract; interest of director.

That a director in a corporation owning ore land, which had determined not to mine, but to lease, the property, is interested in a lease made by the other directors without his participation, and after his express withdrawal, with notice to adverse directors that he favored the lease, *held* not to render him accountable to the corporation, as trustee, for the profits made.

**4. Corporations** ⊜⇒318—Validity of contract; lease of ore lands.

Where two tenants in common of ore land formed a corporation to handle it, with an equal division of stock and directors between them, and one faction refused to mine the property as desired by the other, but after one opposing director had withdrawn leased the same at a royalty satisfactory to it, the fact that its cotenant, through a contract with the lessee, participated in the mining, from which it realized a profit, *held* not to render it accountable to the corporation as a trustee for such profits.

**5. Equity** ⊜⇒65(2)—Right to relief; unclean hands.

Where two directors, who owned one-half the stock of a corporation owning ore lands, as a condition to assenting to a lease of its lands, with other lands owned by them individually, secretly required the lessee to purchase an interest in their lands at an exorbitant price, the corporation *held* not entitled, at their instance and for their benefit, to maintain a suit in equity to require the other directors, who owned the other half interest, to account for profits made through an agreement with the lessee for an interest in the lease.

Appeal from the District Court of the United States for the Western District of Michigan.

Bill by the Arctic Iron Company against the Cleveland-Cliffs Iron Company and another. From a decree for complainant, defendants appeal. Questions certified to the United States Supreme Court. Case remanded for dismissal of bill.

Certified questions dismissed 248 U. S. 178, 39 Sup. Ct. 91, 63 L. Ed. 198.

A. C. Dustin and Horace Andrews, both of Cleveland, Ohio, for appellants.

A. C. Angell, of Detroit, Mich., and S. W. Shaull, of Glendale, Cal., for appellee.

Before WARRINGTON and DENISON, Circuit Judges, and SANFORD, District Judge.

PER CURIAM. As a result of the consideration which we gave to this case after it was submitted, we certified to the Supreme Court several matters which we thought to be questions of law arising upon the record, and each of which might have been decisive of the entire case. The Supreme Court held that the questions were not such as

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the statute contemplated (section 239 of the Judicial Code [Act March 3, 1911, c. 231, 36 Stat. 1157, Comp. St. § 1216]), and dismissed the certificate. 248 U. S. 178, 39 Sup. Ct. 91, 63 L. Ed. 198. After the case was remanded to this court, further argument was permitted, and we now proceed to consider the questions involved as best we may and as far as necessary.

The controlling facts, and what we thought the decisive questions, appear from our certificate, which we reproduce at the foot hereof and adopt as a statement of facts and as a part of this opinion. We do not need to say that this case must be decided, not merely upon a discussion of the general and familiar principles which are invoked by the respective parties, but upon the application of those principles to its own peculiar and essentially unique facts, and some comment is fitting upon the most striking of such facts.

[1] 1. Whatever standing plaintiff has to demand the relief sought depends upon a rule of corporate law, and upon the fact that the interests of the parties were represented by stock in a corporation. This corporation, with its equal division of stock between the two beneficial interests and with its four directors, two allotted to each interest, was the convenient form by which the two tenants in common of real estate made the estate indivisible by the act of either, and provided that nothing should be done with it without the consent of both. The beneficiaries have continually dealt with the property as tenants in common would do. Any such corporation forms as they observed were of no effect as to their substantial mutual relations. When any step was to be taken, it was not considered at a stockholders' or directors' meeting, but was taken up and decided independently by the two interests. If they agreed, the corporate signature was attached; if they disagreed, nothing was done. When the Cliffs, the owner of one-half, desired a lease, it went directly to the owners of the other half and negotiated. When the Oliver sought a lease, it bargained separately and independently with the owner of each half.

The courts have often considered the extent to which the existence of a corporate form dictates the appropriate rule of law. The latest controlling discussion is that found in the opinion of the Supreme Court in Chicago Co. v. Minneapolis, 247 U. S. 490, 38 Sup. Ct. 553, 62 L. Ed. 1229. The principle of the decision is that—

"Where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company so that it may be used as a mere agency or instrumentality of the owning company or companies, * * * the courts will not permit themselves to be blinded or deceived by mere forms of law, but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

This language is used with regard to two corporations, which, for convenience, put their common interests into a third subsidiary corporation, which became merely their instrument for doing their business. It is not easy to see why the principle may not apply as well to stockholding individuals as to stockholding corporations, nor why

261 F.—2

the existence of the corporate shell and corporate forms, without more, should transform what is right into what is wrong; yet, save for the supposed effect of such shell, this suit would never have been brought. We do not overlook the fact that the Chicago-Minneapolis Case is more nearly the converse, than the parallel, of this. There the real parties were not allowed to use the corporate instrument to get an advantage otherwise unlawful; here defendants' proposition is that the corporate cloak should not deprive the parties of a business advantage otherwise lawful—but this distinction may not make the cases any less truly analogous.

The very title of this case involves a fundamental misconception. If we look to the bottom of things, this is not a quarrel between the Arctic Company and the Cliffs Company. It is, and always has been, really a controversy between two hostile and exactly equal groups of stockholders in the Arctic. The man who happened to be president had no more inherent right to bring this suit in the name of the Arctic to impeach the Oliver-Cliffs transaction than the man who happened to be treasurer would have had to bring a suit in the name of the Arctic to affirm it. The suit never was authorized at any stockholders' or directors' meeting; and while that is not in itself finally important, it should be noticed, because it forces us to remember that this suit never could have been authorized at such a meeting, and that such authority was impossible, because an equal part of the corporation approved and an equal part disapproved. There is no real question here, worthy of our study, except whether Mather and the Cliffs did a wrong to Kauffman and Breitung. In such a controversy, no one else has a cent's worth of interest, and the attention of a court of equity should—so far as permitted by rules which it is not safe to vary—be centered upon the real parties in interest and not upon the clothes they wear. It is not necessary to say that there could be no cases—indeed, there might be many—where, in spite of an equal division of stockholding interests and directorships, there would be such real or presumptive dependence by both parties upon all the directors as would leave the normal fiduciary obligations unimpaired. This is not such a case. This is one where the actual relation of the two factions is more important than the theoretical relation which might have existed but did not. So far as appears, there never had been dependence or reliance by either owner upon the other; but, however that might be, it is sure that, before the present series of transactions had been reached and during their continuance, the two factions or interests were occupying positions adverse to each other and were dealing together at arms' length, and both of them fully realized it.

Neither is it necessary to say that this peculiar situation, by which the corporation had become and was the instrumentality of the two real estate owning tenants in common for the unitary and convenient handling of their property, is alone sufficient to dispose of the case; it at least permeates and colors every other question involved, and, before the mere fact of the existence of a corporate form can be allowed to control, calls for the clearest demonstration that fixed and invariable rules for corporate conduct have been violated.

[2] 2. Where a corporation makes a contract with one of its directors, and his concurrence as a director is essential to the corporate action, public policy may require it to be always voidable; but where corporations A and B contract with each other with reference to known adverse and conflicting interests, and have a common director, who withdraws from and abandons his functions as director or officer of A, and negotiates only on behalf of B, and so notifies his associate directors of A, and they accept his notice and the ensuing responsibility, the strictest rule is only that the eventual contract may be voidable by A, if, in fact, it is unfair to A. We know of no principle or precedent which goes further than this. The opinion of the New York Court of Appeals in Globe Co. v. Utica Co., 224 N. Y. 483, 121 N. E. 378, is one of the latest and one of the most extreme applications of the rule that we have seen. It was there held that for the common director merely to withdraw from the dealing was not enough, but that he owed to the first corporation the affirmative and positive duty to disclose the unfair advantage which he knew or should have known would result to the second corporation, and of which it was to be assumed his associates in the first were ignorant. This rule and this principle do not reach the present case. The contract involved no unfairness to the Arctic. At the insistence of the parties now complaining, the Arctic had decided not to mine, but to lease. The royalty price obtained from the Oliver was a fair price. These parties (Kauffman and Breitung) were given a free hand to get the best price they could, and this was the best price that could be obtained from anybody—save only that those now charged with fraud offered a higher price, which those now complaining refused to accept. There is no substantial ground upon which the latter can be heard to say that the contract was burdensome, disadvantageous, or in any way unfair to the Arctic.

It is urged that, even though the ultimate result of the transactions attacked was wholly fair and just, there lurked therein a danger which must condemn them, in that Mather and Hayden continued to be directors of the Arctic, with power to participate in any dispute which might arise between the Arctic and the Oliver as to operations under the lease, and that, in such participation, they would be acting as agents of the Arctic, while in fact they would be interested adversely. Up to the time of bringing suit, no such situation had arisen, because there had been no controversy, and thereafter it never could arise, because their adverse interest was known; but the possibility originally existed. We cannot be content to let this possibility have controlling effect in a situation like this (though it well might in others); whether there is unfairness at the time of the transaction challenged must, ordinarily, be the vital question; whether any future question will arise is wholly problematical; it is difficult to say whether the interested directors will continue to be directors the next year, or the year after; and when, to these contingencies, we add the peculiar character of the relations between the equally divided owners in this corporation, and the natural presumption that those men, if they continued to be directors, would meet any such question as

they met the original problem, and decline to act in the matter at all on behalf of the Arctic, we cannot, merely upon this ground of continuing directorship, characterize this transaction as fraudulent in law.

[3] 3. At the basis of all the legal rules invoked and all the decided cases relied upon by plaintiff lies the idea that it is a wrong for the corporate director to get for himself a profit or an advantage which might have been had for his corporation. We find no justification anywhere, in this class of cases, for repudiating a corporate contract, unless this feature is expressly or presumptively present. From the present case it is utterly absent. The Arctic, yielding to the views of Kauffman and Breitung, and overruling the desire of Mather and the Cliffs, declined to take the risks of a mining operation, but the Cliffs (by the contract now demanded by the Arctic) agreed to buy the ore at the mine and for the cost of mining—and since the mining was to be done by a company which it did not control, this was even more speculative than if it had done the mining itself; and, as pointed out in our statement of facts, the right to purchase one-fourth of the ore, which right the Oliver granted to the Cliffs, could not have been had for the Arctic: First, because the Arctic would not have accepted it with the attendant obligations; second, because the Cliffs, which was paying an independent consideration, would have refused to pay it for the benefit of the Arctic; and, third, because the Oliver would have refused to transfer the right, except in exchange for the outside advantages which the Cliffs alone could give.

We find no substantial basis for any thought that the Arctic has lost any advantage which it might have had, unless it lies in the suggestion that if the expectant interest of the Cliffs in the ore had been disclosed and this had resulted in an abandonment of the entire deal by everybody concerned, the old leases would have remained in existence, and, since the old royalty was higher, this would have turned out to be to the advantage of the Arctic. This is too speculative. The situation must be viewed as it then appeared to all of the experienced and able business men concerned. They all agreed that the old leases were a burden to the Arctic, because the royalty was so high as to discourage, if not forbid, mining; and with the utmost deliberation, and with unimpeached good judgment, Kauffman and Breitung decided that the new long-term lease to the Oliver at about 15 cents (with an annual $37,-500 minimum) was a better asset than the old and nearly expired leases to bankrupt companies at about 40 cents (with an $18,000 minimum). That the market price of the ore would increase so greatly as it did could not be foreseen by anybody; and it is not possible to say that the transaction, which substituted for an existing contract one which seemed to be better, and which everybody in good faith believed was better, should be condemned as a fraud because conditions in later years so developed as to make the old contract more desirable than it had seemed to be.

There is still other ground for thinking that the Arctic lost nothing it had any right to get. Ore in the ground is raw material in its rawest form, like timber on the stump. Excavating and hoisting it, to be ready for sale at the mouth of the mine, is a quasi manufactur-

ing process, like converting standing trees into logs. Ore in the ground, like timber on the stump, has a value in that basic form, and the owner could rightly complain if deprived of any part of this basic value; but the owner has no interest, legal or equitable, in the added value to be given by mining or logging, unless he elects to engage in these manufacturing operations. If a timber-owning corporation has distinctly decided that it will not do any logging, but will sell its timber on the stump, it has renounced the contingent additional return which it might get by the logging operation; and it has small equity to complain if one of its directors enters the field where the corporation has refused to go. If he pays his company the highest price it could get from any one, and still makes a profit, he is making it from exercising a right which the corporation never had perfected—it had only the right to acquire this right—and, in so far as this is true, it becomes immaterial whether the corporation knew of the director's intended conduct. The chance of prejudice to the corporation's real interest is in the danger that the director's undisclosed intention to engage in manufacturing would tend to chill the bidding—to diminish the price which the corporation would get for its raw material; but, if the raw material is sold in good faith to the highest bidder, or if, as here, the sale is actually conducted by the other officers and agents without any participation by the interested director, or if, as here, the interested director himself offers a higher price than the figure at which the others had determined to and did sell, all prejudice is done away with and no reason remains for hesitating to say that the corporation has lost nothing which it had any right to claim.

4. The withdrawal of Mather from the negotiations was unusually complete and unusually indicative. It was not the mere withdrawal of the common director to safeguard against a theoretical, but unknown, conflict of interest. It was accompanied or preceded by express notice to, and knowledge by, Kauffman and Breitung that Mather and the Cliffs had reached an agreement with the Oliver regarding the whole subject-matter, and were prepared to acquiesce in the Oliver lease, and inferentially that the Oliver was paying the Cliffs a satisfactory consideration for this consent to the new contract. When Mather withdrew from the negotiations, he did not leave them in the hands of subordinate or friendly associates; he turned the whole matter over to his hostile and co-equal owner, who was equally competent and who in no degree depended on Mather, but who accepted the entire responsibility of acting for the Arctic in making the contract. Mather, in substance, said to Kauffman and Breitung:

"The Cliffs is interested in this subject-matter and in ways antagonistic to the Arctic; my primary duty is to the Cliffs, which is my corporation; I therefore turn the whole matter over to you, to negotiate and make the best contract you can for the Arctic; and, since you will not, on behalf of the Arctic, accept the better contract which the Cliffs is offering you, we will accept whatever contract you make. I abdicate to you all authority as director of the Arctic, and as an officer of the Arctic I will sign such contract as you wish me to sign."

Any other course by Mather was beset with doubt and difficulties. To disclose the fact that the Oliver had agreed to resell some of

the ore to the Cliffs would have been to reveal, to an adversary, knowledge which he had received as a director of the Cliffs, it would have been to throw away the results of a legitimate business advantage which the Cliffs had bought and paid for, and it would have been to betray the principal to which his primary allegiance was due, and which all parties knew he really represented on the board of the Arctic. In many analogous situations, a director could resign and shift the duty to an impartial successor; but here that could not be done. To carry out the intent of the parties, his successor would have to be also a nominee of the Cliffs and subject to the same duties. To have substituted a successor or nominee who did not happen to have personal knowledge of the transaction would have been to adopt a discreditable subterfuge. Nor could Mather resign without a successor and leave the corporation in control of Kauffman and Breitung as a majority of the board, nor Mather and Hayden resign and leave a board with no quorum. One course would lead to control by Kauffman and Breitung, in violation of the basis of organization, and would be a plain wrong to the Cliffs; the other would prevent any realization from the property or else bring litigation and a receivership.

[4] 5. The principles invoked by plaintiff, if properly applicable, would lead to the conclusion that the Arctic might rescind the contract, even as against the Cliffs. It is not at all clear that they lead farther and permit the Arctic to affirm and adopt the Oliver-Cliffs contract and to recover from the Cliffs its profits (as has been done by the decree below), and this in a situation where it was plainly impossible to refund or make good to the Cliffs the independent consideration it had paid. The Cliffs had bought the entire of the old leases and a half interest in the Arctic stock, and had proceeded thereunder, all with a view to the power which it would have in the matter of disposing of the Arctic ore. The Cliffs was not a trustee; this conduct and these objects were legitimate; Kauffman and Breitung could not have failed to understand their purpose; but, by the decree below, the Cliffs found itself still the owner of half the Arctic stock, but shorn of its control over the disposition of the ore, and subject to a disposition thereof, to which it would not have consented, except for the consideration which is now taken away from it. In respect of these facts, also, the case is unique; and, to say the least, they raise grave doubt as to the plaintiff's right to the remedy it is here pursuing.

6. Of pervading importance is the fact that the transaction now attacked accomplished even-handed justice, and that to upset it would do substantial wrong. Kauffman and Breitung beneficially owned one half of the ore, and the Arctic was a mere trustee for them; the Cliffs beneficially owned the other half, and the Arctic was a mere trustee for it. The Cliffs desired to take the risk of mining and get the expected profits; Kauffman and Breitung refused to do this, and demanded a fixed and certain royalty; the ultimate result is, as the matter stood before this suit was brought, that Kauffman and Breitung get their fixed royalty upon their half of the ore and at the figure which they themselves made, and the Cliffs takes the risk and

gets its profits upon its half of the ore. This is a result which is essentially fair and just to both.

We would not disparage or fritter away the salutary rule that, since a man may not serve two masters, a trustee may not profit from his trust; lest we should seem to do so is our chief anxiety as to this discussion. The legal formulæ invoked by plaintiff were devised to prevent wrong and fraud and unfair advantage; to use them to permit Kauffman and Breitung to get, not only their own share, but part of their associates' share, of the property, and to reap where they not only have not sown, but where they refused to sow, would be, we think, to exalt the letter of these rules to the destruction of their spirit.

7. The views heretofore expressed are those of a majority of the court. One of us is not satisfied that even the considerations recited justify a refusal to extend the rule of law fixing a director's duty so far as to reach this case; but, when we add still another element of the situation, we find ourselves unanimous in the result reached; and in considering this further element we assume, but only for the argument, that defendants' conduct involved a breach of a director's duty. The fourteenth paragraph of the findings discloses conduct by Kauffman and Breitung which makes it unfitting for a court of equity to give relief which is, in effect, for their sole benefit. It is not to be distinguished, in broad principle, from those acts by Mather and the Cliffs of which Kauffman and Breitung complain. They took advantage of their position as directors of the policy of the Arctic, in order to get a personal advantage for themselves, just as the Cliffs used its control of the situation in order to favor its individual interests and plans.

It is not material that the advantage gained by the Cliffs was a degree closer to the subject-matter of the Arctic property than was the benefit seized by Kauffman and Breitung. This benefit was not remote. Kauffman and Breitung owned one-half the fee; the Arctic owned half; the lease to the Oliver was to cover the entire. Kauffman and Breitung required the Oliver to buy one-quarter of this same fee, covered by this very lease, and to pay to them $67,750 more than the then fair value of this quarter. Kauffman and Breitung took their benefit at the beginning; the Cliffs got its interest at the end; but both were incidents of the same transaction. However, it is urged, and it is true, that Kauffman and Breitung were under no obligation to put their personal one-half into the lease, and that it should be inferred that they required the purchase as a condition of their personal action, rather than of their conduct as Arctic directors. Just so is it true that Mather owed to the Arctic no duty to put into the deal the Cliffs' existing outside interests, and the inference is urged that the Cliffs bought the quarter interest in the lease by these external concessions, rather than by Mather's consent as Arctic director. Each inference is correct in part; neither one stands upon the whole truth. There is close analogy between the acts and positions of both parties.

Nor is it material that the Cliffs learned of the advantage taken and submitted to it. It would be otherwise, if the Cliffs were seeking to press an affirmative claim for itself or for the Arctic on account

of this loss or damage; but, if a plaintiff has been guilty of a wrong which makes it unfitting that a court of equity should "incline her gracious ear" to him, his hands are no cleaner just because defendant originally submitted to the wrong as the lesser of two evils.

Nor yet can we think it vital that the court has power to compel—as did the decree below—restitution by Kauffman and Breitung. They took advantage of the situation to sell their property—which, in itself, was taking undue advantage—and they received $67,750 of specially unfair benefit. The Oliver was willing to pay this amount beyond and above what the fee was rightly worth. It is fairly to be inferred that the Oliver would have paid this amount to the Arctic as a bonus, if that condition had been made. Thus Kauffman and Breitung exacted and received that which, when they speak of the action of the Cliffs, they call a bribe. They received this for their own use and intended to keep it themselves permanently. Only when they find that the Cliffs has made a larger profit than they have out of an analogous breach of trust do they ask an accounting as between the two unlawful gains. Courts will not take accountings, as between wrongdoers; they will be left where they are found.[1]

Neither can we think it would be of controlling importance if the finding of facts overstates the reluctance of the Oliver to purchase this fee, nor if the purchase, in the course of years, has turned out to be a good one for the Oliver. The vital thing is that Kauffman and Breitung are asking a court of equity to go beyond any direct precedent, and to the verge of, if not beyond, the applicable legal rule, in order to preserve untarnished a principle of fair dealing; and it appears that they were flagrantly violating the same principle in the same general subject-matter. Whatever limitations ought rightly to be, and often are, imposed upon the doctrine which forbids relief to those with unclean hands, or upon the rule that a court of equity will leave all participating parties where it finds them, we think none of such limitations reach this case.

It is another form of the same underlying thought to say that, by their conduct in using their power to compel a personal benefit, Kauffman and Breitung renounced or denied their trusteeship. They can justify themselves for their conduct regarding the fee only by claiming that their trusteeship did not extend so far, but merely covered the duty to get the best obtainable royalty contract for the Arctic. Indeed, when they refused the Cliffs' offer of a better contract than

[1] Counsel aptly illustrate by a supposititious case: "Suppose A. and B. are partners in business, and, as such partners, are engaged in negotiations for the sale of partnership property to C. Assume that during the negotiations A. goes secretly to C. and demands $100 on the side as a condition to his assenting to the firm selling the property. Assume that B. likewise goes secretly to C. and demands $500 as a condition of his assenting to the sale. Upon B. making his demand, C. informs B. that A. is also making a demand on him, but that A. is only asking $100. However, C. assents to the demand of both parties. The transaction is closed and the bonuses paid, $100 to A. and $500 to B. Later A. discovers that B. got $500, and A. goes into equity for an accounting, asking that B. be required to restore this $500 into the treasury of the firm."

they were getting from the Oliver, they seem to have renounced even that duty. No court can allow them to deny their own trust obligation and at the same time enforce that of their fellow directors.

Holding these views as to the composite effect of these matters, it becomes unnecessary further to consider the other questions involved in the case, some of which were specified in the certificate and others of which are additionally urged in argument. We cannot say that we have studied in detail all of the more than 250 citations by the parties, but we do not think we have overlooked any theory or any authoritative decision urged to support the decree below. It is enough to say that we find no controlling or persuasive case which, either by the exact point decided or by the principles upheld, would justify giving to plaintiff in this case the relief sought, in the face of the inevitable effect of the special facts which we have recited.

We think the bill should have been dismissed, and the case must be remanded for that purpose.

## Certificate Sent to the Supreme Court.

PER CURIAM. For a due understanding of the questions to be certified, we make the following findings of fact:

(1) Prior to 1883, William P. Healy and Edward Breitung, both of Marquette, Mich., arranged to purchase in equal interests an undivided one-half of a large tract of land in that vicinity supposed to contain iron ore. For the purpose of holding title to this purchase, they formed, under the laws of Michigan, a corporation named the Arctic Iron Company (hereinafter called the Arctic). This was in 1883. Its $500,000 of capital stock was paid up by the transfer to it of this half interest in this land. Nominal amounts of stock were issued to Mrs. Healy and Mrs. Breitung, and the total capital held, one-half by Mr. and Mrs. Breitung and one-half by Mr. and Mrs. Healy. The articles of association provided for four directors. Breitung was president, and Healy secretary and treasurer. Thereafter occasional stockholders' and directors' meetings were held, annual reports to the state were made, and conveyances and contracts were, from time to time, executed in corporate form. The corporation had charter power to engage in the mining business, either by itself or by lessees, on that tract of property which it had so acquired. Its actual business, from its organization until 1899, consisted in leasing portions of its property under customary mining leases and receiving royalties therefrom, although, in the earlier part of the period, it did some exploration work. With this exception, the corporate expenses were negligible. There were no salaries paid. In practice Breitung (and, later, Breitung's successors) and Healy consulted and agreed upon what leases should be made, and Healy, in the name of the company, collected the royalties and disbursed them, one-half to Breitung and one-half to himself. These disbursements were entered by Healy on his books as dividends, but were made without any action by the directors. It was the specific intent of Healy and Breitung, in providing for four directors, to effect a perfect balance of power between the two interests.

Breitung also purchased, individually, the other undivided half of parts of the same tract in which the Arctic owned a one-half interest, and also purchased, individually, the entire title to some adjoining properties. About 1886, Breitung died. All his interests in the Arctic and in the real estate which he owned passed to his son, Edward Breitung, Jr., and his widow, Mary Breitung, who afterwards became Mrs. Kaufman. The Breitung interests in these properties were thereafter handled by these parties (hereinafter designated as Kaufman and Breitung) in the same manner as by Breitung, in his lifetime, and the relations between Healy and the Breitung successors continued the same as between Healy and Breitung.

(2) The Cleveland-Cliffs Iron Company (hereinafter called the Cliffs) was a corporation organized under West Virginia laws, having its principal places of business at Cleveland and at Ishpeming, Mich., near Marquette. It had a paid-in capital of substantially $5,-000,000. William G. Mather was president and treasurer. He held $14,100 par value of the stock, and relatives held about $236,000, making a total of about $250,000, or 5 per cent. of the entire capital. The Cliffs owned stock in various subsidiary corporations.

(3) The Oliver Iron Mining Company (hereinafter called the Oliver) was a corporation with its principal office in Pittsburgh. It was largely engaged in iron mining in the Marquette vicinity. It was a subsidiary of and the Michigan operating branch of the Carnegie Steel Company, and later of the United States Steel Corporation. In 1898 and 1899, the Cliffs and the Oliver were the chief operators in the Marquette region, and were the natural and the leading competitors for any mining leases which might be offered; that is to say, the owner of iron ore had the choice between mining, called operating, and offering it for lease to those in the business of operating, reserving a royalty for himself. Such leases were in very common use, and while their details differed, the essentials were three: (1) The amount of royalty per ton; (2) the minimum tonnage guaranteed for each year; and (3) the cash bonus sometimes paid by the lessee for the privilege of getting the lease upon its fixed terms.

(4) On different dates, from 1886 to 1889, the Arctic, as owner of one-half the fee, and Kaufman and Breitung (and, in two of the leases, others, also), owning the other half, executed four mining leases, each for 20 years, covering parcels of the property in which the Arctic was thus interested. A few years later, the lessee's rights under all these leases became vested in two corporations, the Queen Company and the Blue Company (hereinafter collectively referred to as the Queen), and the stock of these corporations was owned by a partnership, Corrigan, McKinney & Co. (hereinafter referred to as Corrigan). The four parcels were thereafter operated under Corrigan together as one enterprise.

(5) Before 1897, the Cliffs had united with another mining operator in building a railroad intended to carry iron ore from the mining districts to the water at Marquette. Each became a large stockholder. In addition, it was agreed that, after the bonds had been paid from earnings, certain additional stock should be divided between them

in proportion to the traffic that each should have brought to the railroad. In that year, a contract was made between the Cliffs, the Queen, and Corrigan whereby the Queen was to give to the Cliffs' railroad the carriage of all ore produced by the Queen mines, at a stated price per ton and until an agreed total had been carried, including all ore produced by other properties which the Queen might thereafter control, and also the carriage of all its traffic of coal and other supplies in the reverse direction, and the Cliffs was to loan $250,000 to the Queen for a stated period upon notes guaranteed by Corrigan. As security for payment of the debt and performance of the traffic contract by the Queen, it transferred to the Cliffs the four mining leases, and Corrigan transferred to the Cliffs all the stock of the Queen with the right to control the Queen by naming directors. The debt was due serially, $50,000 April 2, 1898, 1899, 1900, 1901, 1902. The assignment of the leases to the Cliffs was recorded in Marquette county; and, in February, 1898, Kaufman and Breitung were notified in writing by the Cliffs that it had become interested in these leases and desired notice in case the lessor made any change or in case the lessees made any default.

(6) The terms of royalty and of minimum in the Queen leases were such that whether the lessees could mine profitably depended on the market price of ore at Lake Erie ports. Some of the time prior to 1897 mining under the Queen leases had been profitable; in 1897 and 1898 market prices were low, the Queen could not pay the agreed royalty or meet the minimum without loss, and the lessors had, from time to time, accepted less than the agreed rates rather than forfeit the leases. In the summer of 1898, the iron market was extremely depressed, but a revival of business was anticipated for 1899. The Queen and Corrigan were largely indebted, and Corrigan desired to sell all the rights and interests of the Queen. Kaufman and Breitung were notified of this, and were informed that in this connection Corrigan, or his vendees, would wish to negotiate a new lease with terms more suitable to the existing market, and Kaufman and Breitung indicated a willingness to take up such negotiation. Corrigan undertook to interest both the Cliffs and the Oliver, as competitive customers for the Queen interests, in connection with such new lease. The Cliffs notified Kaufman and Breitung that it desired to negotiate and take such a lease of the Queen properties, but no progress was made towards the arrangement of terms.

(7) On November 30, 1898, the Cliffs purchased from Mr. and Mrs. Healy their one-half of the Arctic stock. Kaufman and Breitung were at once notified of this purchase. One share of the stock was issued to Mather, one share to Hayden, the Cliffs' attorney, and the remainder to Mather, as trustee for the Cliffs. On December 30th a stockholders' meeting of the Arctic was held, at which Kaufman, Breitung, Mather, and Hayden were unanimously chosen the four directors, and Kaufman was made president and Mather secretary. This choice of directors was in recognition and execution of the plan that two directors should be selected by each stockholding

interest. This make-up of officers and directors continued thereafter without change.

(8) During December, the Cliffs definitely offered to take a new lease at an 11-cent royalty and an annual minimum of 100,000 tons. At about the same time the Oliver offered to take such a lease at a higher royalty and a larger minimum. Both offers, as well as the subsequent negotiations by each, contemplated a joint lease from the Arctic and Kaufman and Breitung, so covering the entire title, and were made to and with Kaufman and Breitung as representing themselves and the Arctic. Each offering company, the Cliffs and the Oliver, was of the highest standing, both financially and for integrity and fairness, and for skill in mining, and save for the terms which might be offered, there was no reason for preferring one to the other as lessee; but, by reason of personal feeling held by Kaufman and Breitung, or one of them, against Mather, they had a fixed determination not to lease to the Cliffs, nor permit the Arctic to do so, but rather to lease to the Oliver, if, and as soon as, they could get from it satisfactory terms. In January, Kaufman and Breitung, for themselves and the Arctic, promised the lease to the Oliver at a 15-cent royalty, on condition that the minimum and other terms could be thereafter agreed upon. Learning of this, the Cliffs offered to take the lease at the same terms in all respects which the Oliver had offered or might offer, and, in addition to pay a substantial bonus. Kaufman and Breitung refused, alleging that they were fairly bound to carry out the arrangement with the Oliver. Shortly thereafter, Kaufman and Breitung were notified that the Cliffs would not consent to this Oliver lease. They threatened legal proceedings to compel the Cliffs to consent, but never took any steps in that direction. They knew that the Oliver lease could not be made without the Cliffs' consent, and for two reasons: (1) The Cliffs was an equal stockholder in the Arctic, and two of the four directors had been selected as representatives of the Cliffs. (2) The deal for a new lease involved the payment by the Oliver of (about) $100,000 to Corrigan for the interests of the Queen under the existing leases controlled by the Cliffs, and the elimination of these leases; it required the consent of the Cliffs to the cancellation of the traffic contract between the Queen and the Cliffs, or the acceptance by the Cliffs of another party in substitution for the Queen in this contract; and it required the consent of the Cliffs to accept payment of the debt due it from the Queen but which was not due for an average of two years. The old leases could not be surrendered by the Queen, without the Cliffs' consent, and they could not be canceled by the lessors, if the Cliffs, as assignee of the lessees, was willing to make good whatever default by the lessees might exist.

The Cliffs thus had it in its power to, and did, absolutely block the proposed lease to the Oliver; Kaufman and Breitung had it in their power to, and did, block any lease to the Cliffs; and this deadlock continued for some time and until broken as hereafter stated.

Although, as the iron ore market later developed, it turned out that under the existing leases and during their term the Arctic would have received much more royalty returns than it later did receive during the same period under the new lease, yet at the time good business judgment dictated the acceptance by the Arctic of the proposed new lease on the terms offered by the Oliver (and, of course, on the better terms offered by the Cliffs); and the action of each Arctic faction in refusing to consent was inspired by motives of independent interest or feeling aside from interest in the Arctic.

(9) At the instigation of Corrigan, the Cliffs and the Oliver took up negotiations between themselves to see if the Cliffs could not be induced to withdraw its objection to the Oliver lease and to its substitution for existing leases. It resulted that the Cliffs offered the Oliver to withdraw objection if it should be permitted to buy from the Oliver, each year, at cost of mining, one-fourth of the ore taken out by the Oliver under the lease. The Oliver consented, and this arrangement was made, subject to the final negotiation of all the terms of the lease between the Oliver, on the one side, and Kaufman and Breitung, on the other. The Cliffs, at the time, alleged as its reason for taking this fraction of the ore, that, in substantial effect, Kaufman and Breitung owned three-fourths and the Cliffs one-fourth of the ore in the ground, and that, in substantial effect, this arrangement permitted Kaufman and Breitung to lease their three-fourths on any terms they could agree upon, and permitted the Cliffs to keep its one-fourth for itself.

(10) This understanding between the Cliffs and the Oliver being had, Kaufman and Breitung were directly or indirectly informed and fully understood that an agreement had been reached between the Oliver and the Cliffs, because of which the Cliffs would no longer object to the Oliver lease; that Kaufman and Breitung were at liberty to go ahead on behalf of themselves and the Arctic and negotiate the best terms they could get from the Oliver; and that, when terms had been agreed upon satisfactory to Kaufman and Breitung and the Oliver, the Cliffs, as the controller of the existing leases which blocked the way, would consent to their cancellation; and the Cliffs, as a stockholder in the Arctic, would sanction, and Mather and Hayden, as directors in the Arctic, would approve, and Mather, as an officer of the Arctic, would execute, a lease embodying such terms. Kaufman and Breitung made no inquiry concerning the terms of the agreement which they thus learned had been made between the Cliffs and the Oliver.

(11) The Cliffs knew that, if Kaufman and Breitung learned that it was thus getting one-fourth of the ore they would refuse to go on. The Cliffs and Mather, therefore, then and thereafter, did not disclose to them this fact, and requested the Oliver not to disclose the same, and the Oliver complied. Both the Cliffs and the Oliver took pains to put the deal in such shape that papers likely to be seen by Kaufman and Breitung should not reveal this fact. By these means it came about that Kaufman and Breitung did not learn that the Cliffs was to be interested in the ore.

(12) Thereupon, on the one hand, Kaufman and Breitung, for

themselves and the Arctic, and, on the other hand, the Oliver, proceeded to agree upon the details and all the terms of the lease. Kaufman and Breitung insisted upon many concessions, and, in the end, procured the best terms in all respects for the Arctic that could have been procured from the Oliver or from any one—i. e., 15 cents and 250,000 tons minimum—(except as the fact that the Cliffs was willing to offer better terms, and other facts herein specifically found, may affect this conclusion). In the negotiations with the Oliver, neither the Cliffs nor Mather took any part, excepting as to certain details affecting other interests which the Cliffs had in the subject-matter, and which other interests we have not stated, since their connection with the questions now involved is remote. The contract so agreed upon having been reduced to form, and being approved as to form in all details by counsel for Kaufman and Breitung, for the Cliffs and for the Oliver, it was approved by a stockholders' meeting of the Arctic, the Cliffs' stock being voted in the affirmative, and was approved by a directors' meeting of the Arctic by the unanimous vote of the three directors present, Kaufman, Breitung and Hayden (Mather being not present); and having been signed by Kaufman and Breitung in their individual rights, and the signature of the Arctic having been attached by Kaufman, as president, Mather, as secretary of the Arctic, attested the signing.

(13) The general understanding existing between the Cliffs and the Oliver prior to the executing of the Arctic-Oliver lease, was later carried out by the following definite agreement, and its provisions are to be taken as contemplated at the earlier period: That they would organize a corporation, the Regent Mining Company, with a cash capital of $450,000, of which the Oliver would pay in three-fourths and the Cliffs one-fourth; that the new lease would be assigned to the Regent which would assume and carry out the traffic contract and pay to the Cliffs its $250,000 debt, and pay to Corrigan and the Queen 100,000 tons of ore (then worth about $100,000) for their interest in the old leases; that in lieu of dividends, the Oliver would buy of the Regent, at the cost of mining, three-fourths, and the Cliffs would buy one-fourth of the ore mined each year; and that the Cliffs would pay the Oliver, in cash, one-fourth of the $131,500 which the Oliver had paid Kaufman and Breitung for one-fourth of the fee in some of the parcels leased, as hereinafter stated. It was further provided that, by notice given in any year before the season of navigation opened, the Cliffs could limit the amount of ore which it would take under the contract during the then current year (it being contemplated that all ore shipments would be by water between April and December).

This arrangement between the Oliver, the Cliffs, and the Regent went into effect in the spring of 1899. In 1904, Kaufman and Breitung first acquired knowledge of the fact that the Cliffs had this interest in the lease. Thereupon, and without any action by the stockholders or directors of the Arctic or any request therefor, Kaufman and Breitung caused the bill of complaint in this cause to be filed in the name of the Arctic, as complainant, and executed by Kaufman,

president, and Breitung, director. By this bill, they sought a decree that all the interests in the lease held by the Cliffs or Mather, including the one-sixteenth interest in fee bought from the Oliver and including the Cliffs' stockholding interest in the Regent, were held in trust for the Arctic, and were, in equity, the property of the Arctic, and should be conveyed to the Arctic upon payment to them by the Arctic of what, upon an accounting, might be found to be the actual, legitimate cost thereof to the defendants; that the defendants account to the Arctic for all profits from the ores received by them under the lease and under the Regent stockholding—the Arctic offering to pay to defendants any sums which might be found equitable on account of the prayed substitution of the Arctic for defendants in these property interests; and that the defendants be enjoined from otherwise disposing of this property, and that plaintiff have general relief. The district court, on final hearing, decreed the existence of the trust as prayed, and directed an accounting; upon such accounting, which covered the period till 1913, the master found that the Cliffs, in the course of carrying on one branch of its general business, had made, from the resale of the ore which had come from the one-fourth of the lease, profits amounting to $900,000. The district court thereupon rendered judgment against the Cliffs and Mather for the amount of profits so found. The $112,500 paid by the Cliffs for its share of the Regent capital was credited to the Cliffs, in stating the account of profits.

(14) In one of the leased parcels only an undivided one-fourth of the fee had belonged to Kaufman and Breitung, until they had purchased another one-fourth thereof from Rees. In closing the terms of the lease with the Oliver, they insisted, as a condition of making the lease, that the Oliver should buy this Rees one-fourth interest in the fee of this parcel for $131,500 cash. The Oliver acquiesced and paid that sum. Kaufman and Breitung did not disclose to the Cliffs that they were making this sale in connection with the lease; but the Cliffs learned this fact from the Oliver, and, as a condition of getting one-fourth of the ore taken under the lease, the Cliffs acquiesced in the Oliver's request that the Cliffs should buy from it one-fourth of this interest or one-sixteenth of the fee for the price of $32,875, and the Cliffs paid that sum in cash to the Oliver. The price so received by Kaufman and Breitung, $131,500, was twice the then fair value of the one-fourth interest purchased, and the Oliver purchased the same, not because it otherwise desired such interest but because it was necessary to make the purchase at this price in order to get the lease from Kaufman and Breitung. In the accounting, this $32,875 was credited to the Cliffs.

(15) Wherever the action of the Cliffs is herein referred to, it acted immediately by Mather, its president and treasurer. He consulted, from time to time, with members of the executive committee of the Cliffs' board of directors, but no formal action at stockholders' or directors' meetings was taken in regard to any of the subject-matter. In fact, Mather acted wholly on behalf of the Cliffs and in no respect in his personal interest (except as such interest existed

through his stockholding in the Cliffs). It was fully understood by Kaufman and Breitung that Mather was thus speaking and acting for the Cliffs. Mather neither expected nor received any personal benefit whatever from any of the transactions herein recited.

(16) Kaufman and Breitung were very large owners of iron ore lands in Michigan and other states. They were men of great business experience and ability in all matters pertaining to iron ore. In these. respects, they were on an equality with Mather, and in concluding, as directors of the Arctic, to make the Oliver lease, they did not in fact rely in any degree upon Mather's judgment, but relied upon themselves and their own ability to make a good bargain. Mather exercised no influence or efforts to bring about the making of the lease to the Oliver, nor did he in any way mislead or deceive or defraud Kaufman and Breitung in the subject-matter—unless such misleading or fraud is to be inferred as matter of law from his directorship in the Arctic and his keeping from his fellow directors knowledge that the Cliffs was acquiring an interest.

(17) By the secret coming in of the Cliffs as partial lessee, the Arctic suffered no prejudice, but rather benefit, since the Cliffs' interest had a tendency to increase the minimum to which the Oliver would agree in advance, and to increase the amount mined and paid for every year. It would have been impossible for Mather. to have procured for the Arctic this concession of one-fourth the ore at cost, which was procured for the Cliffs. This is for three reasons: (1) The Oliver would not have consented, as it could not have received from the Arctic the considerations it was getting from the Cliffs. (2) Kaufman and Breitung, for the Arctic, would not have consented, since their fixed policy was to lease on royalty and not to undergo any of the risks of mining or of dealing in ore; and, by the advance notice provision, the Cliffs could only minimize, not escape, mining and market risks. With this fixed policy, it is certain that Kaufman and Breitung would not have allowed the Arctic to invest $145,375 cash with the Oliver in the Regent. (3) The Cliffs would not have consented, since it would not allow the Arctic to get the benefit of concessions resulting from the Cliffs' control of the situation.

(18) Upon the whole transaction, on the one hand, the Cliffs received: (a) The chance of profit on the one-fourth of the ore; (b) full payment of its debt from the Queen. On the other hand, it paid, invested in, or submitted to: (a) The chance of loss on the ore; (b) $32,875 in a fractional fee interest it did not want; (c) $25,-000 (about) to Corrigan for the Queen interest in the old leases; (d) $87,500 ($112,500—$25,000) toward the working capital of the Regent, a corporation in the control of others; (e) the substitution, as its traffic debtor, of a corporation in the control of a competitor for a corporation controlled by itself.

Upon these facts we desire the instruction of the Supreme Court for our proper decision of the following questions of law arising thereon (which for clarity we state in alternative form):

1a. Is the Cliffs, stockholder in the Arctic and also Mather's independent principal, so far affected by any fiduciary duties which may

have rested on its agent, Mather, as a director in the Arctic, that the Arctic may recover from the Cliffs the latter's profits under the lease, although no trust rested directly upon it, and although the director, Mather, received no personal benefit? or,

1b. Is plaintiff's remedy, if it has any as against the Cliffs, confined to rescission?

2a. Does the conduct of Kaufman and Breitung, in insisting upon benefit to their outside interests as a condition of their consent to the lease, bar them, in their own names or in the name of the Arctic, from complaining in a court of equity of the conduct of the Cliffs, in insisting upon benefit to its outside interests as a condition of its consent to the lease? or,

2b. Did their conduct pertain to a matter so distinct from that conduct of the Cliffs, of which they complain, that the rule of clean hands does not apply?

3a. When Kaufman and Breitung were informed that the Cliffs had reached with the Oliver such an agreement that the Cliffs was willing to withdraw further objection to the Oliver lease, were they then and there bound to inquire as to the terms of such agreement, and when they did not, but proceeded without inquiring, did they thereby so far acquiesce in whatsoever terms were included in the agreement that a court of equity will not entertain their later complaint? or,

3b. Were they justified in assuming that the agreement did not pertain to the lease itself, but to some outside matters of conflicting interests between the Cliffs and the Oliver?

4a. Under the existing make-up of the Arctic, did Mather, as one of the Cliffs' directors of the Arctic, owe any duty to the Arctic or to the Breitung directors thereof to disclose that he had an outside interest in a contract which was about to be made by the Arctic and which was in fact well advised and for the best interest of the Arctic? or,

4b. Was his directorship duty, under the existing relations of the two bodies of stockholders to each other and to the Arctic, and after he had offered to procure for it an even better contract, satisfied so long as he did nothing to promote the proposed contract and left the decision whether it should be made and the terms thereof wholly to the Breitung directors?

5a. When it appeared that the Cliffs had interests and desires pertaining to the new lease which might conflict with the course Kaufman and Breitung desired the Arctic to take, did the Cliffs and Mather perform every duty which by law rested upon him as director of the Arctic and through him upon the Cliffs when Mather withdrew from any further participation in the matter and notified Kaufman and Breitung that they could go ahead and make for the Arctic a contract satisfactory to them, and that the Cliffs and Mather would acquiesce therein? or,

5b. Was it the duty of Mather, as director in the Arctic, either to disclose to Kaufman and Breitung what he had done and the knowl-

261 F.—3

edge he had acquired as an officer of the Cliffs and on behalf of the Cliffs, or else to resign as a director in the Arctic?

6a. If it was the legal duty of Mather to disclose to the Breitung directors the fact that the Cliffs was to be interested in the lease, is the further fact, that, as the net result of the transaction, Kaufman and Breitung leased their beneficial three-fourths in the ore upon their own terms and the Cliffs retained its one-fourth interest in the ore, sufficient to bar a court of equity from enforcing any trust which might otherwise arise in favor of the Arctic in and to such one-fourth interest? or,

6b. Did such trust, as matter of law, become so fixed that a court of equity will proceed according to the legal rights of the Arctic without regard, in this particular, to the relative beneficial interests of the stockholders?

Since we are of the opinion that there was no fraud or misleading or breach of directorship duty by Mather, unless the same arose, wholly as matter of law and as a presumption of law, from the relations of the parties herein set out, the question so presented has seemed to us proper for certifying to the Supreme Court. This question is thought to be stated in its most inclusive form by No. 5. What we regard as a narrower phase of the same matter is formulated by No. 4. Nos. 1, 2, 3, and 6 present other problems, each of which will be controlling of the case, if answered adversely to plaintiff, and those questions are included in this certificate because we desire the instruction of the Supreme Court thereon, and because we assume that the Supreme Court may prefer to conclude that it is unnecessary to answer 4 and 5 because of some matter involved in another question. However, we consider that No. 5 presents the question of law which is, in the view most favorable to plaintiff, the ultimate one; and we desire that this question be answered, without prejudice from the inclusion of others in this certificate, if it shall be thought that the inclusion of the others is not in accordance with the practice of the Supreme Court in this respect.

We have considered—and reached a conclusion concerning—several issues of law not covered by any questions certified, and several issues of fact not mentioned herein.